## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

**DANIEL J. RYAN**, **TARA M. KREUDER**,
and **MYA RYAN**,

         Plaintiffs,

v.

**THE TOWN OF AMHERST**
c/o Town Attorney
5583 Main Street
Williamsville, New York 14211

**AMHERST CENTRAL SCHOOL
DISTRICT**,
55 Kings Highway
Amherst, New York 14226

**AMHERST CENTRAL SCHOOL
DISTRICT BOARD OF EDUCATION**,
55 Kings Highway
Amherst, New York 14226

**GREGORY PIGEON**, individually and in his
capacity Principal of the Amherst Central School
District High School,
4301 Main Street
Buffalo, New York 14226

**HEATHER KYSTOIAK**, individually and in
her capacity as Vice Principal of Students at the
Amherst Central School District High School,
4301 Main Street
Buffalo, New York 14226

**SCOTT LAWNICZAK**, individually and in his
capacity as a Vice Principal at the Amherst
Central School District High School,
4301 Main Street
Buffalo, New York 14226

**COMPLAINT
AND JURY DEMAND**

   Civil Action No.:   24-cv-536

**DAVID BENTON**, individually and in his
capacity as a Guidance Counselor at the Amherst
Central School District High School,
4301 Main Street
Buffalo, New York 14226

**MARK BECHTEL**, individually and in his
capacity as School Resource Officer of the
Amherst Central School District High School
and Officer for the Town of Amherst Police
Department,
4301 Main Street
Buffalo, New York 14226

**RONALD SMITH**, individually and in his
capacity as a Detective for the Town of Amherst
Police Department,
500 John James Audubon Parkway
Amherst, New York 14228

**DAVE SCHNEIDER**, individually and in his
capacity as a Detective for the Town of Amherst
Police Department,
500 John James Audubon Parkway
Amherst, New York 14228

**KATHERINE VAN LEAN**, individually and in
her capacity as a Caseworker for the Erie County
Child Protective Services,
2875 Union Road, Suite 356
Cheektowaga, New York 14227

**CHRISTINE FILIPSKI**, individually and in
her capacity as a Caseworker for the Erie County
Child Protective Services,
2875 Union Road, Suite 356
Cheektowaga, New York 14227

**EVELYN FOREMAN**, individually and in her
capacity as a Caseworker for the Erie County
Child Protective Services,
2875 Union Road, Suite 356
Cheektowaga, New York 14227

2

**ADAM SIDOTE**,
8495 North Main Street
Eden, New York 14057

**JULIE MUDD**,
8495 North Main Street
Eden, New York 14057

**C.S.**,
8495 North Main Street
Eden, New York 14057

**HEATHER SIDOTE**,
10354 New Oregon Road
North Collins, New York 14057

Defendants.

Plaintiffs, Daniel Ryan, Tara M. Kreuder, and Mya Ryan (collectively referred to as "Plaintiffs") by their attorneys, Rupp Pfalzgraf LLC, as and for their complaint against the defendants, Town of Amherst, Amherst Central School District, Amherst Central School District Board of Education, Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel, Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman, C.S., Adam Sidote, Heather Sidote, and Julie Mudd (collectively referred to as "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      Among other important interests, Plaintiffs file this action to vindicate and secure their fundamental parental rights to direct the upbringing and physical and mental health decision-making of their child, and hopefully to deter Defendants from taking similar actions in

the future—i.e., deliberately concealing the location of a minor from her parents merely because school officials decided they did not agree with the parenting style of the child's parents.

2.      In this case, as explained in detail below, Defendants violated Plaintiffs' fundamental right to intimate association by conspiring together with a family that used Mya to help control their mentally disturbed son, C.S., and by hiding and concealing Mya from her parents, who Defendants believed were not appropriately parenting her.

3.      Indeed, when Mya ran away from her parents and started to complain to school officials that her father was physically abusive towards her, school officials at Amherst Central High School immediately jumped on board with Mya's plan to live at the home of a boy she barely knew, with a family that, as it turns out, had a history of taking in runaway minors who could be used as girlfriends to have sex with C.S., which his parents had learned was the only way to control their son.

4.      As a result of Defendants' actions, Plaintiffs suffered tremendous anxiety, embarrassment, extreme emotional and psychological distress, violations of privacy and loss of liberty and innocence, as well as violations of their civil and constitutional rights under the laws of the United States and State of New York as a result of Defendants' actions and omissions.

5.      By way of this action, Plaintiffs seek damages and the vindication of their rights under the United States Constitution.

## JURISDICTION AND VENUE

6.      This action is brought under 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

4

7.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of the Plaintiffs' constitutional and civil rights.

8.      Plaintiffs further invoke this Court's pendent jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all state law claims and as against parties that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York because the events forming the basis of Plaintiffs' complaint occurred in this District.

## **PARTIES**

10.      Daniel J. Ryan and Tara M. Kreuder are the parents of Mya Ryan. Plaintiffs currently live and reside in Eden, New York.

11.      Defendant, the Town of Amherst, was and is a municipal corporation duly organized and existing under the laws of the State of New York, and it has a business address at 5583 Main Street, Williamsville, New York 14221.

12.      Defendant, Amherst Central School District, is a municipal entity duly organized and existing under the laws of the State of New York, it exercises control and supervision over Amherst Central High School, and it has a business address at 55 Kings Highway, Amherst, New York 14226

13.      Defendant, Amherst Central School District Board of Education, is organized and existing under the laws of the State of New York, it exercises control and

supervision over Amherst Central High School and Amherst Central School District, and it has a business address at 55 Kings Highway, Amherst, New York 14226

14.     Defendant, Gregory Pigeon, was and is a resident of the County of Erie and State of New York.  He was employed by the Amherst Central School District at all relevant times, and he was acting within the scope of his employment and official capacity as Principal of Amherst Central High School at the time of the incidents giving rise to this lawsuit.  In addition, Gregory Pigeon is being sued in his individual capacity for damages caused by his actions and/or conduct.

15.     Defendant, Heather Kystoiak, was and is a resident of the County of Erie and State of New York.  She was employed by the Amherst Central School District at all relevant times, and she was acting within the scope of her employment and official capacity as Vice Dean of Students of Amherst Central High School at the time of the incidents giving rise to this lawsuit.  In addition, Heather Kystoiak is being sued in her individual capacity for damages caused by her actions and/or conduct.

16.     Defendant, Scott Lawniczak, was and is a resident of the County of Erie and State of New York.  He was employed by the Amherst Central School District at all relevant times, and he was acting within the scope of his employment and official capacity as Vice Principal at Amherst Central High School at the time of the incidents giving rise to this lawsuit. In addition, Scott Lawniczak is being sued in his individual capacity for damages caused by his actions and/or conduct.

17.     Defendant, David Benton, was and is a resident of the County of Erie and State of New York.  He was employed by the Amherst Central School District at all relevant times, and he was acting within the scope of her employment and official capacity as a School

Counselor at Amherst Central High School at the time of the incidents giving rise to this lawsuit. In addition, David Benton is being sued in his individual capacity for damages caused by his actions and/or conduct.

18.    Defendant, Mark Bechtel, was and is a resident of the County of Erie and State of New York, and he was and is a School Resource Officer employed by Amherst Central School District and the Town of Amherst Police Department at all times hereinafter mentioned. Officer Bechtel was acting within the scope of his employment and official capacity as a School Resource Officer at Amherst Central High School at the time of the incident giving rise to this lawsuit.  In addition, Officer Bechtel is being sued in his individual capacity for damages caused by his actions and/or conduct.

19.    Ronald Smith was and is a resident of the County of Erie and State of New York.  Detective Smith was acting within the scope of his employment and official capacity as a Detective employed by the Town of Amherst Police Department at the time of the incidents giving rise to this lawsuit.  In addition, Detective Smith is being sued in his individual capacity for damages caused by his actions and/or conduct.

20.    Dave Schneider was and is a resident of the County of Erie and State of New York.  Detective Schneider was acting within the scope of his employment and official capacity as a Detective employed by the Town of Amherst Police Department at the time of the incidents giving rise to this lawsuit.  In addition, Detective Schneider is being sued in his individual capacity for damages caused by his actions and/or conduct.

21.    Defendant, Katherine Van Lean, was and is a resident of the County of Erie and State of New York.  She was and is a Supervising Investigator employed by the Erie County Child Protective Services ("CPS") at all times hereinafter mentioned and was acting

within the scope of her employment and official capacity as a CPS Supervising Investigator at the time of the incidents giving rise to this lawsuit.  In addition, Ms. Van Lean is being sued in her individual capacity for damages caused by her actions and/or conduct.

22.     Defendant, Christian Filipski, was and is a resident of the County of Erie and State of New York.  She was and is a Caseworker employed by CPS at all times hereinafter mentioned and was acting within the scope of her employment and official capacity as a CPS Caseworker at the time of the incidents giving rise to this lawsuit.  In addition, Ms. Filipski is being sued in her individual capacity for damages caused by her actions and/or conduct.

23.     Defendant, Evelyn Foreman, was and is a resident of the County of Erie and State of New York.  She was and is a Caseworker employed by CPS at all times hereinafter mentioned and was acting within the scope of her employment and official capacity as a CPS Caseworker at the time of the incidents giving rise to this lawsuit.  In addition, Ms. Foreman is being sued in her individual capacity for damages caused by her actions and/or conduct.

24.     Defendant, Adam Sidote, was and is a resident of the County of Erie and State of New York.  At all relevant times, Adam resided with his son, C.S., and his girlfriend, Julie Mudd, at 8495 North Main Street, Eden, New York 14057.

25.     Defendant, Julie Mudd, was and is a resident of the County of Erie and State of New York.  At all relevant times, Julie resided with her boyfriend, Adam Sidote, and his son, C.S., at 8495 North Main Street, Eden, New York 14057.

26.     Defendant, C.S., was and is a resident of the County of Erie and State of New York.  At all relevant times, C.S. resided with his father, Adam Sidote, and his father's girlfriend, Julie Mudd, at 8495 North Main Street, Eden, New York 14057.

27.     Defendant, Heather Sidote, was and is a resident of the County of Erie and State of New York.  At all relevant times, Heather resided at 10354 New Oregon Road, North Collins, New York 14057.

## STATEMENT OF FACTS

28.     On or about May 23, 2022, Mya's mother smelled a peculiar odor emanating from Mya's bedroom.

29.     Upon entering the room, Tara inquired whether Mya had been smoking marijuana.

30.     Mya refused to acknowledge her mother's inquiries, and she left the home abruptly.

31.     Tara presumed that Mya left for Amherst Central High School, where she was enrolled at the time as a high school junior.

32.     Later that afternoon, however, Tara learned that Mya had in fact not gone to school; rather, Mya disappeared to stay with an individual who was unknown to her parents.

33.     After learning that Mya failed to go to school—and without knowing where or with whom she was staying—Tara began to fear for her daughter's safety, and so she decided to request the help of the Town of Amherst Police Department by calling to report Mya as a missing person.

34.     On or about May 24, 2022, School Resource Officer, Mark Bechtel, with the Town of Amherst Police Department was able to locate Mya at Amherst Central High School and speak with her.

35.     Mya told Officer Bechtel (and her high school counselor, Dave Benton) that day that she intended to return home after school and work.

36.     A detective with the Town of Amherst Police Department then called back Tara and instructed her to file another missing person report if Mya failed to return home that night.

37.     Much to her parent's dismay, however, Mya failed to return home that night.

38.     The next day, on or about May 25, 2022, Tara again reported Mya as missing to the Town of Amherst Police Department, but she was provided no information and to her knowledge no investigation was opened to search for and find her missing minor daughter.

39.     From May 24-27, Mya stayed with various friends of hers who all could allow Mya to stay with them and their family on a temporary basis (a night or two) but could not allow Mya to stay with them for a long period of time.

40.     Mya was desperate at this time to find a long-term solution so that she did not have to go home to live with her parents, who Mya believed treated her unfairly and in far too restrictive of a manner.

41.     Mya's desperation for a long-term housing solution took a turn for the worse when she reached her final destination—the home of C.S., Adam Sidote, Julie Mudd, which is located at 8495 North Main Street, Eden, New York 14057 ("the Sidote home").

42.     Indeed, unbeknownst to Mya, arrival at the Sidote home was not the refuge that she was so seeking; rather, it commenced a summer riddled with physical and sexual abuse.

10

43.     During the approximate three months that she resided at the Sidote home, Mya endured daily physical, sexual, and verbal abuse from C.S. while residing in the Sidote home.

44.     Upon information and belief, Adam Sidote and Julie Mudd actively concealed Mya from her family to allow C.S. to prey on her and use her as a stay-at-home girlfriend to have sex with.

45.     In fact, C.S. and his father often would accompany Mya during her day-to-day activities in order to keep an eye on her and guard her in the event she was seen by her parents.

46.     At the time of Mya's arrival, C.S. was an unemployed 16-year-old high school dropout who was more than willing, with the support of his parents, to provide a hideaway for young Mya.

47.     For years, C.S. and his parents struggled with behavioral issues related to C.S.'s own mental health issues.  In fact, C.S.'s parents allowed him to stay home and stop going to school his sophomore year when he was just 14 years old due to the difficulty they had controlling his behavioral and mental health issues.

48.     Upon information and belief, C.S. was out of control and his parents desperately needed assistance with keeping C.S's wild emotions at bay.

49.     For example, when C.S. was upset, he threw temper tantrums, punched holes in walls, and generally destroyed the Sidote home while Mya lived there, and likely before as well.

50.     Upon information and belief, C.S. rarely was disciplined for these poor behavior outbursts, and in fact he never was disciplined by his parents during the time that Mya lived in the Sidote home.

51.     Mya's relationship with C.S. and his parents quickly evolved into a *quid pro quo* dynamic—i.e., in exchange for allowing her to reside in their home, Mya was to pursue a role as C.S's caretaker and accommodate his demands, including sexually related demands that Mya was not interested in accommodating.

52.     Pursuant to this arrangement, Mya would quell the wild behavior of C.S. and make him more manageable and easier to deal with for his parents.

53.     To a certain extent, C.S's parents also came to depend on Mya for keeping their out-of-control son somewhat restrained and calm.

54.     Shortly after meeting Mya, C.S.'s parents even went so far as to *encourage* Mya to perform her role as C.S.'s caretaker and satisfying his sexual desires, which quite disturbingly included Adam Sidote giving condoms to the two minors on the first day Mya moved into the Sidote home.

55.     A few days after this encounter, Adam confronted Mya and asked her if she was on birth control, and in fact suggested to her that she go on birth control.

56.     C.S.'s parents also told Mya that each night she stayed at the Sidote home she was expected to prepare C.S.'s food.

57.     These actions, questions, and statements from C.S.'s parents led Mya to not only feel uncomfortable, but also to feel that she was expected to have sex with C.S. and take care of him in exchange for staying at the Sidote home.

58.     Moreover, C.S.'s mother often talked to Mya about her having a baby with C.S. and wanted C.S.'s nephew to refer to her as "Aunt Mya," which contributed to her uneasy feelings about staying at the Sidote home and her belief that she only was welcome to stay at the Sidote home because of her relationship with C.S., including her role of satisfying C.S.'s sexual desires.

59.     C.S. also would not allow Mya to leave his sight and he supervised her around the clock.

60.     For example, Mya was not to shower unless she was in the presence of C.S., and when Mya left to use the restroom C.S. insisted on going into the bathroom with her each time.

61.     Upon information and belief, Adam Sidote, Heather Sidote, and Julie Mudd all knew of these peculiar behaviors by C.S., but they did nothing to stop C.S. from invading Mya's personal privacy.

62.     Specifically, approximately two months after Mya started to live at the Sidote home, Adam and Julie confronted Mya and C.S. and told them to stop going into the bathroom together, but that was only because C.S.'s younger siblings were coming home soon and C.S.'s parents did not want the younger siblings to know their older brother was watching Mya use the bathroom and shower.

63.     In addition, the expectation from C.S.'s parents was that Mya was to sleep in bed with C.S. each night.

64.     When Mya attempted to go and sleep in an area of the Sidote home where C.S. was not sleeping, she was met with C.S.'s temper and his parents did nothing to stop him.

65.     For example, when Mya attempted to resist C.S.'s sexual advances and go sleep in a different bedroom, C.S. would restrain Mya and keep her on the bed and have sex with her without her consent.

66.     In addition to harming her physically and emotionally, C.S. was also bad for Mya's school-related issues at Amherst Central High School.

67.     C.S. often would pressure (and usually he ultimately would persuade) Mya to skip school so she could be with him because he could not stand being without her for even short periods of time.

68.     C.S.'s parents knew about and encouraged Mya to skip school because, upon information and belief, they were nervous that she might leave and never return to their son if she left the Sidote home, and further they were worried that Mya's parents might see her and take her back home so they told C.S. and Mya to stay out of Amherst entirely.

69.     When Mya would resist C.S.'s pressure to skip school, C.S. would often respond by refusing to drive her to school.

70.     Nevertheless, there were days where C.S. reluctantly would drive Mya to school, and then he would wait in the school parking lot for *the entire school day* waiting for her to return so he could drive her home.

71.     Upon information and belief, this was not the first time that C.S. and his parents took in a minor girl who ran away from her home in order for C.S. to have a stay-at-home girlfriend that accommodated his every need and sexual desire.

72.     For instance, C.S. and his parents took in a young woman identified in this complaint as N.D., who was a sophomore in high school at the time and ran away from her parents' home.

73.     Once N.D. lived at the Sidote home for a period of time, C.S.'s parents convinced her to file for emancipation and they helped her with retaining an attorney to assist her with the process.

74.     Upon information and belief, similar to what happened to Mya, C.S.'s parents made comments and took actions directed towards Natalie that made it apparent she was only welcome to stay at the Sidote home so long as she was involved in a sexual relationship with C.S.

75.     Eventually, N.D. was able to leave this horrible living situation, but not without emotional and psychological scars as a result of her being trapped by the desire of C.S.'s parents to make her a stay-at-home girlfriend to appease the sexual desires of their difficult and mentally disturbed child.

76.     Meanwhile, while Mya was being used as a stay-at-home girlfriend for C.S. at this disturbed family's home, Amherst Central High School took deliberate actions to hide Mya from her parents and conceal her location.

77.     As explained above, it was on or around Memorial Day weekend when Mya found her way to the Sidote home.

78.     That next week Mya returned to school, and her first day back she was swarmed by Principal Gregory Pigeon and several other teachers who came up to her at lunch and asked her for information on where she was staying.

79.     During Mya's absence, Tara and Daniel relentlessly attempted to contact Amherst Central High School and the Amherst Police Department to find out where their daughter was and to make sure she was safe.

15

80.     At no time, however, was Mya informed by any of these entities about her parents' extensive efforts to contact and locate her.

81.     Upon information and belief, Principal Pigeon knew of Tara and Daniel's desire to communicate with their daughter and have her come home, and so he approached Mya in the lunchroom after Memorial Day weekend with no intention of actually finding out where she was staying to help her parents.

82.     Rather, upon information and belief, Principal Pigeon approached Mya in the lunchroom in an attempt to learn more about why she was running away from home so Pigeon could conspire with these other entities to keep Mya hidden from her parents—which is what he ultimately wanted.

83.     In fact, prior to Principal Pigeon's attempt to speak to her in the lunchroom, Mya had met with her high school guidance counselor, David Benton, on numerous occasions to discuss instances where she felt mistreated and abused by her parents.

84.     Mya's allegations to Counselor Benton included claims that her father was physically abusive towards her.

85.     Counselor Benton knew quite a bit about Mya's strained relationship with her parents and, upon information and belief, Counselor discussed Mya's claims of physical abuse by her father with Principal Pigeon prior to Mya running away from home on May 23, 2022.

86.     When Mya met with Counselor Benton when she came back to school after Memorial Day weekend, Mya had approximately a 15-minute meeting with Benton and not once during that meeting did he ask Mya any questions about where she was staying or with whom.

87.    In fact, Mya's entire meeting with Counselor Benton focused only on why she did not want to return home and whether Daniel was being physically abusive towards her.

88.    Upon information and belief, Counselor Benton focused his meeting with Mya on whether she ran away from home due to abuse from her father because he knew that, prior to Mya running away from home in May 2022, on or about February 17, 2022, Mya contacted the Town of Amherst Police Department to report her father for pushing her to the ground following an argument about Mya skipping school that day.

89.    According to the accompanying police report, when Amherst police officers responded to the scene, they found Daniel outside the residence and he appeared to be agitated according to the officers.

90.    When the officers asked Daniel what happened, he told them that he started to get ready for work and realized that Mya did not go to school.

91.    Daniel told the officers that this was an ongoing problem, and that Mya was failing out of Amherst Central High School and her BOCES "Harkness" program due to her poor attendance record.

92.    Frustrated with Mya's apparent decision to skip school again on February 17th, Daniel told the officers that a verbal argument ensued between him and Mya, and during this verbal argument Mya started to point her finger in Daniel's face.

93.    Daniel then grabbed and restrained Mya to get her out of his personal space, and as a result she fell to the ground.

94.    The Amherst police officers then spoke with Mya, who confirmed Daniel's rendition of the events that transpired leading to her 911 call.

95.     In fact, Mya told the officers that she was being disrespectful to her father and that was why he shoved her.

96.     The officers then left the scene after they were satisfied with their investigation and felt everyone was safe.

97.     No charges were filed, and the officers had no concerns with Mya and her father returning home together after work and school that day.

98.     That February 17th incident led to a report to CPS alleging that Daniel abused and maltreated Mya.

99.     On or around March 1, 2022, Daniel received a letter saying that he was the target of the CPS complaint and Tara received a letter that she was a witness for it.

100.     That report and complaint was investigated by CPS and, on April 7, 2022, CPS sent separate letters to Daniel and Tara notifying them that the reports of them allegedly abusing and maltreating Mya on February 17, 2022 were "unfounded," which means that "CPS did not find a fair preponderance of the evidence that [Mya] was abused or maltreated" by Daniel or Tara.

101.     Later during Mya's first week back to school after Memorial Day weekend, she was stopped in the hallway by Officer Bechtel, who asked her what was going on at home.

102.     Mya told Officer Bechtel that she was kicked out by her parents because she was vaping in the house.

103.     Officer Bechtel told her it wasn't a big deal and that he would walk her the rest of the way to class.

104.    Mya told Officer Bechtel during that walk that she planned to go back home the next day after work.

105.    With weeks now passing with no contact from Mya and no word on where she was staying Tara and Daniel were desperate for reassurance that Mya was safe.

106.    On June 1, 2022, Tara and Daniel contacted the Town of Amherst Police Department to file another missing person report, and they were met with snide comments and reluctance from the officers with whom they spoke.

107.    Around that same time, on or around June 1, 2022, Tara called the Amherst High School and asked them if Mya was in school.

108.    When a representative with the Amherst High School told her no, she asked why she was not contacted by someone at the school to tell her that her daughter did not go to school that day.

109.    The person who spoke with Tara brushed off her concerns and incredibly told her that it was not the school's responsibility to keep track of Mya's whereabouts.

110.    What Tara was told by this Amherst High School representative, however, is in direct contravention with Amherst School District policies and procedures, which require that parents be notified when students do not attend school.

111.    Not receiving any assistance from Amherst High School or the Amherst Police Department, Tara and Daniel then hired a private investigator to find their daughter, and only then were they able to find out that she was staying at the Sidote home.

112.    After they found out where she was staying, in a desperate attempt to see their daughter and talk with her about why she was not returning home, Tara and Daniel

arranged a meeting to take place at the Amherst Central High School, on June 3, 2022, to speak with Mya.

113.     Upon information and belief, the Amherst Central School District never had the intention of complying with the agreed-upon arrangement with Tara and Daniel that they would meet with Mya on June 3rd to discuss her whereabouts and whether their minor child was safe.

114.     For example, at no time did anyone affiliated with the Amherst Central School District tell Mya that her parents were coming in to meet with her that day.

115.     Moreover, on the day of the scheduled meeting, Mya was pulled out of class by Amherst Central High School's Vice Dean of Students, Heather Kystoiak, who told Mya that a detective with the Town of Amherst Police Department wanted to speak with her.

116.     At no time did Ms. Kystoiak tell Mya that her parents were scheduled to see her that day.  In fact, Ms. Kystoiak specifically told Mya that she did not know her parents were coming into school that day.

117.     Counselor Benton also called Mya into his office, and Mya spoke with him briefly that day as well.

118.     At no time during that meeting, however, did Counselor Benton tell Mya that she was scheduled to meet with her parents.

119.     Upon information and belief, the Amherst Central School Defendants, CPS Defendants, and Amherst Police Defendants all conspired to ensure that Mya did not meet with her parents on June 3rd so that she could continue to hide from them and not return home.

120.     Upon further information and belief, Defendants conspired to do so because they incorrectly and wrongfully believed that Mya was being abused by her father, and

so they decided to take the role of judge, jury, and executioner, while conveniently avoiding all appropriate legal channels, to prevent Mya's parents from parenting her the way they saw fit.

121.    When they arrived at the meeting, Mya's parents instantly were met with a suspicious ambush by Ms. Krystoiak, Counselor Benton, Officer Bechtel, and Detectives Smith and Schneider.

122.    When Tara and Daniel asked where their daughter was, they told her that she was in the conference room, and that only Tara was allowed to go in and speak with Mya.

123.    At no time did any of the Defendants or anyone affiliated with Amherst Central School District ask Mya if she wanted to speak with her father or mother that day.

124.    Angry that Defendants would not allow him to see his daughter, Daniel became irate and demanded to be able to go into the room and speak with Mya.

125.    Tara then told the Defendants that she would not go into the conference room without her husband because they are a family and Mya's absence from the home was a family issue.

126.    In response to Tara and Daniel's protestations about Daniel not being allowed to go into the room to see his daughter, Detectives Smith and Schneider became combative and told Tara and Daniel that "we are not here to parent your kid." Tara responded that she and Daniel did not ask Defendants to parent Mya, and that she did not know who the Detectives were or why they were there. Tara then told Daniel that Defendants and the Detectives were not there to help them and turned around and started to walk out of the school.

127.    Detective Smith then waved his finger in Daniel's face, and Daniel told the officer not to wag a finger in his face.

21

128.    The situation then spiraled out of control, and Defendants and Mya's parents became agitated and angry with each other.

129.    At that time, Tara left with Daniel when it became apparent that Defendants were not there to help them.

130.    Defendants continued to antagonize Tara and Daniel as they left the school.

131.    Tara was the first to leave the school, and she stood outside the door waiting for Daniel when she heard the school go into lockdown as Daniel was walking out of the school with Officer Bechtel.  Tara heard Officer Bechtel apologize for how "it all happened" and Tara then asked him who was picking up Mya from school.  Officer Bechtel responded that it was "a younger boy."  He then apologized again as Tara and Daniel were walking out to their car.

132.    After Tara and Daniel walked out of the school, Counselor Benton was the first person to enter the conference room where Mya was being kept.

133.    Strangely, Counselor Benton lied to Mya and told her that he just got there and did not know what happened between Defendants and her parents, even though Tara and Daniel saw and spoke with Benton when they first arrived and saw him there the whole time.

134.    Ms. Krystoiak was the next person who entered into the conference room, and immediately she apologized to Mya for the disturbance outside the conference room between Mya's parents and the Amherst School Defendants and Amherst police officer defendants, and an individual with the Amherst Central School District, Scott Lawnsack, then started to ask Mya for information regarding where and with whom she was residing.

135.    Mya immediately disclosed the address for the Sidote home and information, including names, about the individuals she was living with, including Adam Sidote, Julie Mudd, and C.S.

136.    After providing this basic information, Ms. Krystoiak and Counselor Benton led Mya to a room where they locked her in and told her she was not allowed to leave for the rest of the school day.

137.    At no time did Ms. Krystoiak, Mr. Lawniczak, Counselor Benton, or anyone else affiliated with Amherst Central School District ask Mya if her living situation was safe or ask her any details about where and with whom she was sleeping every night and if she was comfortable with that arrangement.

138.    After being kept in the room for a while, a CPS worker named Evelyn Foreman entered the room and spoke with Mya.

139.    CPS Investigator Foreman met with Mya for no more than 15 minutes, and all of her questions were focused on whether Daniel was physically abusive towards Mya.

140.    At no time did CPS Investigator Foreman ask Mya any questions about her living situation at the Sidote home and whether she was safe.

141.    While Mya was being kept locked in the room by the Defendants, Tara and Daniel drove to the location of her BOCES "Harkness" program because Mya was scheduled to go that day and they knew they would be able to speak with her there.

142.    Knowing, however, that Tara and Daniel would try to meet with Mya there, the defendants, including but not limited to Principal Pigeon, Detective Smith, and Detective Schneider, conspired together to keep Mya from going to her BOCES program, and therefore to keep Mya hidden from her parents.

23

143.    When they didn't see Mya at her BOCES program, Tara and Daniel assumed that she stayed at Amherst Central High School that day, and so they drove back to the front parking lot where all students typically were picked up by either busses or parents in their cars and where they knew they would see Mya leave the school.

144.    Tara and Daniel returned to Amherst Central High School after dismissal, and they were met outside by Gregory Pigeon, who downplayed the entire incident, including putting the school on lockdown.  He told Tara and Daniel that it was a customary practice since they were in the hallway, and Tara then asked why they were in the hallway for the meeting. Officer Bechtel then approached Tara and Daniel, and he was no longer apologizing and spoke with a different tone.  He told Tara and Daniel that they made Defendants put the school on lockdown, to which Principal Pigeon stepped in and said he already told Tara and Daniel that it was standard practice.

145.    Knowing that Mya's parents were parked in the front parking lot and waiting for Mya so they could catch her before she left and speak with her, the defendants, including but not limited to Principal Pigeon, Detective Smith, and Detective Schneider, conspired together and instructed C.S. and Adam Sidote to go to a back parking lot at the school so they could pick up Mya without her parents seeing whose car she got into.

146.    Principal Pigeon, Officer Bechtel, Detective Smith, and Detective Schneider then escorted Mya from the classroom to the back parking lot for the high school, where they walked her to C.S.'s car and handed her to the people who turned Mya into a stay-at-home girlfriend to appease the sexual desires of a young boy who clearly is mentally disturbed.

147.    Quite notably, Adam Sidote followed C.S. to the school in his own car, and he was around the corner when Principal Pigeon, Detective Smith, and Detective Schneider walked Mya to C.S.'s car.

148.    Even though it should have been strange to these defendants to see that Adam followed C.S. in his own car, they did not ask C.S. or Adam why they drove to the school in separate cars.

149.    Moreover, these defendants, did not ask C.S. or Adam any questions about Mya's living situation and whether she was safe.

150.    In fact, these defendants did not speak with Adam at all, and they only asked Mya whether her father had any firearms as she entered into C.S.'s car.

151.    Due to the defendants' actions to conceal Mya and her whereabouts, Tara and Daniel were unable to find out what car C.S. and Adam drove as they did not see Mya leave the school premises.

152.    Tara and Daniel did not get to speak with Mya at all that day.

153.    On June 6, 2022, Amherst Central School District Superintendent, Anthony J. Panella, wrote to Daniel and notified him that a "No Trespassing" order had been issued based on what happened at the attempted June 3rd meeting.

154.    On June 8, 2022, Tara Kreuder and Daniel Ryan received separate letters from CPS Investigator Foreman and her supervisor, Katherine Van Lean, stating that, "[o]n June 3, 2022, the New York Statewide Register of Child Abuse and Maltreatment (SCR) received a report alleging that you have abused or maltreated a child."

155.    The letters to Tara and Daniel further stated that the investigation was assigned to CPS, and, upon information and belief, that investigation was led by CPS

Investigator Foreman, another CPS Investigator by the name of Christian Filipski, and CPS Supervisor Van Lean.

156.    Upon further information and belief, it is believed that one or more of the Defendants caused a report to be issued against Tara and Daniel alleging that they abused and maltreated Mya in retaliation for simply trying to see and speak with their daughter on June 3rd.

157.    Defendants, including but not limited to Principal Pigeon, Detective Smith, and Detective Schneider, all engaged in and caused confrontational conversations with Tara and Daniel on that date but never allowed them to see Mya.

158.    However, in retaliation for Tara and Daniel's rebellious attitude and failure to abide by the Defendants' plan for how the meeting would be conducted (i.e., not allowing Daniel to speak with his daughter and only allowing Tara to do so), in addition to the Defendants' apparent issues with Tara's and Daniel's parenting style, one or more of the Defendants abused their power and caused a CPS report to be issued against Tara and Daniel simply because they knew it would create a long and expensive process of fighting the charges in the CPS complaint that would cause further strife for the family.

159.    Incredibly, to add insult to injury, the CPS report that was issued against Tara and Daniel for the June 3rd incident was based on claims of "inadequate guardianship," Despite the fact that Tara and Daniel had been denied the ability to parent Mya by virtue of the defendants' conduct.

160.    In other words, because Tara and Daniel refused to take no for an answer when Defendants told them Tara, but not Daniel, could see Mya (without even asking Mya if that was what she wanted), Defendants believed that Tara and Daniel were not properly parenting of safeguarding the wellbeing of their child.

26

161.     Defendants' allegations were baseless as Tara and Daniel spent all day on June 3rd trying to find their daughter and speak with her, but Defendants actively concealed her and prevented Tara and Daniel from finding Mya and determining where and with whom she was staying.

162.     On June 17, 2022, Tara and Daniel received separate letters stating that the CPS report had resulted in "indicated" findings against them, which meant "CPS found a fair preponderance of evidence that [Tara and Daniel] abused or maltreated [Mya]."

163.     These bogus charges eventually were dismissed by CPS without even a formal hearing, but not until over a year later and not without Tara and Daniel being forced to incur substantial attorneys' fees and costs to defend themselves against these meritless charges, which remained pending for over a year and caused substantial emotional and psychological distress for Plaintiffs and further unnecessary strife for their family.

164.     Upon information and belief, the only "investigation" that was done by the CPS investigators, Evelyn Foreman, Christian Filipski, and Katherine La Vean, between the date of the incident and June 17, 2022 (the date of the indicated finding) was a less-than-fifteen-minute video conversation with Adam Sidote regarding Mya's living situation at the Sidote home.

165.     Specifically, about a week after the June 3rd meeting, CPS Investigator Foreman contacted Adam Sidote and advised him that she would like to discuss Mya's living situation via a video chat.

166.     In an effort to deceive CPS into believing that Mya had her own bedroom, C.S.'s parents instructed Mya to assist Adam in preparing for the virtual phone call by throwing

her clothes on the floor of an unoccupied bedroom and hanging clothes in the closet to make it appear that she was living in her own room.

167. Mya complied with these instructions from Adam Sidote and Julie Mudd.

168. The next day, CPS Investigator Foreman had a video phone call with Adam Sidote that lasted approximately ten minutes.

169. Upon information and belief, CPS Investigator Foreman never asked to speak with Mya.

170. Upon further information and belief, when CPS Investigator Foreman inquired about Mya's drug usage, Adam Sidote lied and stated that she was not using drugs or drinking alcohol.

171. Upon further information and belief, during this phone call, Adam Sidote showed CPS Investigator Foreman the room that was filled with Mya's clothes.

172. Upon further information and belief, from that point forward, it was the belief of CPS Investigator Foreman—and by extension the other CPS investigators involved in the investigation of Mya's living situation with the Sidotes and her relationship with her parents—that Mya had her own bed to sleep in (when in reality C.S.'s parents knew that Mya was slept with C.S. in his bedroom every night).

173. In fact, part of the reason C.S.'s parents did not want Mya sleeping in the unoccupied room in the Sidote house was because C.S.'s sister died when she was 12 years old, and the unoccupied room was where she stayed.

174. Every time Mya stayed in the sister's old room, C.S.'s parents became upset with her and criticized her for doing so.

175.    Sometimes C.S. would pressure Mya (and other girlfriends of his) to have sex with him by saying she needed to "do it for Sydney," the name of his dead sister.

176.    C.S.'s parents often would put tremendous pressure on Mya with respect to her relationship with C.S., subjecting her to extreme emotional abuse.

177.    For example, Adam Sidote would tell Mya things like "stop using [C.S.] for a place to stay" when C.S. was angry or upset with her (which was often), and also "I hope you're not using my son for a place to stay."

178.    Adam also would ask Mya and C.S. openly about their sex life, which furthered Mya's reasonable belief that it was the expectation of C.S.'s parents that she have sex with C.S. in return for a place to stay.

179.    Moreover, C.S.'s parents took numerous actions to assist Mya in limiting her family's ability to access and communicate with her.

180.    For example, on or around June 13, 2022, C.S.'s parents, with the help and assistance of officers with the Town of Amherst Police Department, convinced Mya to file for an order of protection against her father, Daniel Ryan, and they assisted her in the process of doing so.

181.    Familiar with the process of filing for an order of protection based on prior minor children that they took in to keep their mentally disturbed son occupied, C.S.'s parents told Mya what paperwork to fill out, how to fill out that paperwork, and where to go to file that paperwork to seek an order of protection against Daniel.

182.    Mya complied with the instructions of C.S.'s parents by filing for an order of protection against Daniel in Erie County Family Court because she was told by C.S.'s parents

and the officers with the Town of Amherst Police Department that she would get her clothes and other items from her parents' home if she filed for the protection order.

183.    That order of protection, however, was never issued based on a lack of evidence to support that such an order against Daniel and in Mya's favor was necessary or proper.

184.    In addition, upon information and belief, one or more members of the Town of Amherst Police Department, including Detectives Smith and Schneider, advised Mya to get an order of protection against her parents so that she could go home and grab some of her belongings to live at the Sidote home on a permanent basis.

185.    In addition, without ever speaking to Mya's parents first to seek permission or learn their position on the subject, and even though Julie Mudd knew Tara Kreuder from high school, was friends with Tara, and could have contacted her if she wished, C.S.'s parents contacted a lawyer in an effort to assist Mya in obtaining an emancipation order.

186.    Upon information and belief, C.S. and his parents had experience with seeking an emancipation order because C.S.'s prior ex-girlfriends, including Natalie, also resided in the Sidote home after running away from their families, and C.S.'s parents assisted those minor girls—who merely were having typical teenage issues with their parents and therefore more susceptible to believing that their life would be better without their parents—with obtaining an order of protection and emancipation order.

187.    Ultimately, Mya dropped the order of protection when she realized that it would keep her from going to her sister's wedding.

188.     Moreover, regarding her sister's wedding, which was scheduled for July 9, 2022, Mya received texts from her father, mother, and sister inquiring as to whether she would be in attendance.

189.     Mya responded that she would, and when C.S.'s parents found out she was going, they told her it was not a good idea for her to go there and be with her family.

190.     In this case, knowing how important her sister's wedding and her attendance was to her family, Mya did not comply with the pleas and demands from C.S.'s parents to not go to her sister's wedding, and so she told them that she would be attending the July 9th wedding.

191.     Reluctant to allow Mya out of their sight and back into the grasp of her parents, C.S. and his father insisted that they drive Mya to the wedding rather than allow her family drive her to the wedding.

192.     C.S. and his father dropped Mya off in the Walmart parking lot next to the wedding venue because Adam Sidote was afraid that Mya's father might confront them at the venue.

193.     Mya was able to celebrate her sister's wedding with her family, and in fact all four of the family members took a photograph together to commemorate the occasion.

194.     By all accounts, the wedding was a success and without any issues.

195.     Nevertheless, brainwashed by C.S. and his parents, who told Mya that she would never be loved again by anyone else based on what C.S. had done to her, including vaginal and anal rape on a repeated basis, Mya returned to the Walmart parking lot and got back into the car with Adam and C.S. and allowed them to take her back to the Sidote home.

196.     Throughout the summer of 2022, C.S. and his parents drove Mya out of state and out of the country on multiple occasions without knowledge or consent of Mya's parents.

197.     For example, C.S.'s mother, Heather Sidote, had a cottage in Sherkston, Canada, and C.S. took Mya there on at least four occasions during the summer of 2022.

198.     Knowing that she would not be able to cross the border without it, Adam Sidote forged Daniel Ryan's signature on a letter that stated Mya's parents knew and allowed her to travel across the border and into Canada.

199.     Adam told Mya to present the letter to the border agents if there were any issues or if they were stopped in trying to cross the border from the United States into Canada.

200.     Each time that Mya was taken by C.S. to his mother's cottage in Canada, they were left alone with no parent supervision and so they would use drugs and alcohol with other minors.

201.     Upon information and belief, Adam Sidote, Heather Sidote, and Julie Mudd all allowed Mya and C.S. to go to Canada even though they knew there would be no parent supervision and further knew that they would be using drugs and alcohol.

202.     Mya and C.S. would also have access to motor vehicles at Heather Sidote's cottage—such as golf carts and ATVs—and C.S.'s parents knew or should have known that the minors would use those motor vehicles while intoxicated.

203.     On one occasion, C.S. caused a motor vehicle crash while he was driving Mya and goofing around.

204.     C.S., however, blamed the crash on Mya and told his mom that she was driving at the time of the crash.

205. Heather Sidote in turn threatened to make Mya pay her thousands of dollars in damages for the motor vehicle crash that was caused by C.S.

206. In addition, C.S.'s father would allow C.S. and Mya to hang out at Heather Sidote's house, in which he knew or should have known there was no adult supervision.

207. Heather Sidote's home was filled with dirt, trash, and animals that were not taken care of, and there were numerous occasions where Mya and C.S. witnessed and interacted with various strange men visiting Heather's home.

208. C.S.'s parents knew, or should have known, that C.S. was much more aggressive and physically abusive towards Mya when he was not being supervised by parents.

209. C.S.'s parents also knew, or should have known, that C.S. would force Mya to have sex more often when his parents were not around.

210. In sum, C.S.'s parents knew, or should have known, that Mya was not safe around C.S. without parental supervision.

211. Mya was forced to suffer in this nightmare situation until the end of August, when Tara and Daniel were able to send an officer over to retrieve their daughter and finally bring her back home to safety.

212. Since returning home, Mya is torn up and emotionally scarred from the traumatic summer she was forced to endure at the hands of C.S. and his parents, and Daniel and Tara are heartbroken over the impact these incidents have had on their daughter.

213. In addition to the emotional and psychological trauma that endures for their daughter, Tara and Daniel also have experienced significant emotional and psychological distress from these events.

214.    Only though therapy, medication, and time has Mya been able to finally reveal to her parents the horror that took place at the Sidote home in the summer of 2022.

215.    Since revealing the fact that she was raped on a repeated basis, Tara and Daniel have suffered tremendous emotional and psychological injuries knowing that their minor daughter was hurt in a way that can never be healed.

216.    These psychological injuries are permanent and continuing in nature and for which Plaintiffs are entitled to significant damages.

217.    For Daniel, worried sick that he would never be able to see his child again, he was unable to work during this time when Mya was away from the home with the Sidote family, and he therefore lost significant income and business opportunities.

218.    Daniel also suffered emotional and psychological distress as a result of his worry over his child's safety, and now again he has been re-traumatized after learning what she was forced to endure at the Sidote home as a result of Defendants' actions to deliberately hide her from her parents.

219.    Quite disturbingly, since leaving the Sidote home, Mya has confronted C.S. and his parents through text messages about the physical and sexual abuse that she was forced to suffer at the hands of C.S. in the summer of 2022.

220.    On one occasion, Mya was texting C.S. and Heather Sidote in a group chat, and Mya accused C.S. in the group chat of raping her.

221.    Heather responded by texting "[t]hats (sic) a terrible accusation," and when Mya responded by telling Heather that she saw Mya right after the rape, C.S. responded by writing "she's not wrong mom, you literally had a talk with me."

34

222.    Heather responded to C.S.'s incredible admission by writing, "Stop ok. You two ive (sic) had enough."

223.    Mya ended the texting conversation by writing to both Heather and C.S. "Adam [Sidote] also had a talk with him when he raped [N.D.]" and "Good parents."

224.    In addition, since leaving the Sidote home, C.S. has messaged Mya and admitted to her that he raped Mya, Natalie Duggan, and other past girlfriends as well.

225.    C.S. has admitted to vaginal and anal rape of Mya and other minor children.

226.    Upon information and belief, C.S.'s parents have had numerous conversations with him about his criminal sexual acts, and therefore they have and had at all relevant times actual knowledge of the danger that their son presented to young minor girls.

227.    Despite this actual or constructive knowledge of the danger their son posed to others, they not only allowed it, but they encouraged and enabled it as well by providing C.S. unsupervised places to take his girlfriend where his parents would either provide or allow C.S. and his girlfriend to use drugs and alcohol freely, thus putting these minor girls in greater danger of C.S.'s sexually deviant behavior.

228.    Again, rather than properly investigate Mya's living situation to make sure she was safe living with the Sidotes, Defendants, individually and collectively, took a very casual approach to this matter and took very few actions to make sure the Sidotes were an appropriate family to care for Mya and supervise her to ensure her safety.

229.    Defendants also took no steps to investigate the Sidotes's past attempts to take minor girls into their home, against the wishes of the parents of the minor girl, to be used as a stay-at-home girlfriends for their mentally disturbed son.

230.    In failing to take these necessary steps to conduct a reasonable investigation regarding Mya's safety under the circumstances, Defendants in fact placed Mya in great danger and caused irreparable harm to her psychological and emotional well-being, and for these reasons Plaintiffs seek substantial damages to appropriately compensate them for the harm caused by Defendants' egregious violations of the most basic and fundamental rights for any United States citizen—i.e., the ability to raise, supervise, and parent their child in the manner that they deemed most appropriate to give their child the best chance to succeed and be happy in life.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATION OF THE FIRST AMENDMENT**
**First Amendment Retaliation under 42 U.S.C. § 1983**
**Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton,**
**Officer Mark Bechtel, Detective Ronald Smith, Detective Dave Schneider,**
**Katherine Van Lean, Christian Filipski, and Evelyn Foreman**

231.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 230 of this complaint as if fully set forth herein.

232.    Upon information and belief, taking issue with Plaintiffs' consistent criticism of Defendants for failing to help with locating their daughter and due to the incident at Amherst Central High School involving Mya's parents on or about June 3, 2022, one or more of the Defendants contacted CPS in retaliation for Plaintiffs' critical speech of Defendants' actions in concealing their daughter from them.

233.    Specifically, upon information and belief, one or more of Defendants caused a CPS report for "inadequate guardianship" to be issued against Tara and Daniel, which had no basis in fact at all and was reported purely in retaliation.

36

234. Plaintiffs' criticism of Defendants was noncommercial speech and hence, was protected by the First Amendment.

235. Plaintiffs' speech did not violate any law.

236. Defendants' conduct and actions, including the false report to CPS, were motivated and/or substantially caused by Plaintiffs' critical speech of Defendants and their handling of Mya's situation.

237. The conduct and actions of Defendants were done intentionally, maliciously, with deliberate indifference, and/or with reckless disregard for the natural and probable consequences of their acts.

238. Defendants' conduct and actions were done without lawful justification or reason and caused injury to Plaintiffs, as described above.

239. The aforesaid conduct by Defendants was willful, malicious, oppressive, and/or reckless and was of such a nature that Plaintiffs claim punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

## SECOND CAUSE OF ACTION
### Violation of the Fourteenth Amendment
### Procedural Due Process Violation under 42 U.S.C. § 1983
Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel, Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman, <u>C.S., Adam Sidote, Heather Sidote, and Julie Mudd</u>

240. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 239 of this complaint as if fully set forth here.

241. Under the Fourteenth Amendment to the United States Constitution, no government official shall "deprive any person of life, liberty, or property, without due process of

law."

242.    In addition to protecting certain unenumerated rights, the Due Process Clause of the Fourteenth Amendment also has a procedural aspect which guarantees an individual's right to fair procedures before depriving a person of "life, liberty, or property."

243.    Plaintiffs had sole and exclusive rights to the care, custody, and control of their child.

244.    These Defendants condemned Mya's parents for struggling with Mya and concluded that Mya was safer living with a boyfriend who raped and abused her without first providing Plaintiffs with notice and without providing the Plaintiffs with any opportunity or forum to resolve matters before irreparable damages ensued at the expense of infant Mya.

245.    In committing these acts, these Defendants failed to provide reasonable notice of any kind to Plaintiffs that the above-referenced determinations had been made and, thus, they prevented the Plaintiffs from attempting in any way to oppose or to prevent their vulnerable daughter being entrusted to manipulative and sadistic criminals.

246.    Mya was not endangered by living in the home of her family and since there was no emergency with respect to Mya's wellbeing, Plaintiffs were entitled to a pre-deprivation hearing before these Defendants actively engaged in concealing Mya and depriving Plaintiffs from exercising their rights as her parents as required under the Due Process Clause of the Fourteenth Amendment.

247.    As a result of their actions and inactions, these Defendants deprived Plaintiffs of their procedural due process rights.

248.    The conduct by these Defendants was committed under the color of state law.

249.     These Defendants acted in concert with C.S., Adam Sidote, and Julie Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint action theory.

250.     As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

251.     The conduct by these Defendants was willful, malicious, oppressive, and reckless, and was of such a nature that Plaintiffs claim punitive damages against each of them in an amount commensurate with the wrongful acts alleged.

**THIRD CAUSE OF ACTION**
**Violation of the Fourteenth Amendment**
**Substantive Due Process Violation under 42 U.S.C. § 1983**
**Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel, Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman, C.S., Adam Sidote, Heather Sidote, and Julie Mudd**

252.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 251 of this complaint as if fully set forth here.

253.     Under the Fourteenth Amendment to the United States Constitution, no state shall "deprive any person of life, liberty, or property, without due process of law."

254.     In addition to guaranteeing certain procedural protections, the Due Process Clause of the Fourteenth Amendment guarantees certain substantive protections to parents, including the substantive right to remain with their children without the interference of the State.

255.     These Defendants acted arbitrarily, oppressively, and in a conscience-shocking manner in authorizing and hiding infant Mya from her parents so that she could live in

the home of a rapist to be sexually, physically, and emotionally abused.

256.    These Defendants improperly declared an emergency where no circumstances justifying emergency measures existed, provided no notice to Plaintiffs, and consciously disregarded the rules and procedures in place to protect the due process rights of Plaintiffs, thereby intentionally depriving Plaintiffs of their parental and other rights without an opportunity to be heard.

257.    Plaintiffs' substantive due process rights under the Fourteenth Amendment of the Constitution of the United States were violated, as Plaintiffs have suffered a loss of the right to care and control the upbringing of their infant daughter and they have incurred liabilities in the form of a private investigator fees, attorneys' fees, and other costs, due to the illegal acts of these Defendants.

258.    The deprivation of the Plaintiffs' familial rights by these Defendants was an arbitrary and capricious violation of Plaintiffs' due process rights.

259.    These Defendants were deliberately indifferent to the possibility that their actions and omissions would lead to a deprivation of constitutionally protected rights.

260.    The conduct by these Defendants involved reckless or deliberate and callous indifference to Plaintiffs' rights.

261.    These Defendants intentionally or recklessly failed to provide Plaintiffs with an opportunity to be heard before depriving Plaintiffs of the right to care and to control the upbringing of their child.

262.    The actions by these Defendants deprived Plaintiffs of their substantive due process rights guaranteed by the Fourteenth Amendment.

263.    The conduct by these Defendants was committed under the color of state

law.

264.    These Defendants acted in concert with C.S., Adam Sidote, and Julie Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint action theory.

265.    As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

266.    The conduct by Defendants was willful, malicious, oppressive, and reckless, and was of such a nature that Plaintiffs claim punitive damages against each of them in an amount commensurate with the wrongful acts alleged.

**FOURTH CAUSE OF ACTION**

**Violation of the Fourteenth Amendment**
**Violation of the Equal Protection Clause under 42 U.S.C. § 1983**
**Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel, Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman, C.S., Adam Sidote, Heather Sidote, and Julie Mudd**

267.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 266 of this complaint as if fully set forth here.

268.    The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

269.    The allegations described above demonstrate that Plaintiffs appear to have been singled out and treated very differently from other parents who have struggled with stereotypical teen rebellion in Amherst.

270.     These Defendants violated Plaintiffs' well-established rights under the Equal Protection Clause of the Fourteenth Amendment in that they deprived Plaintiffs, without due process of law, of their right to care for their minor daughter by concealing Mya and preventing Tara and Daniel from locating and speaking with Mya by repeatedly and egregiously violating school procedures and policies that were in place and followed for other parents and students at Amherst Central High School.

271.     Upon information and belief, had these school procedures and policies been followed—such as the rule to notify parents when their child does not attend school or when a child goes home with someone other than a parent or not on a bus that takes the child home—Mya would not have been victimized by C.S. and his family.

272.     Through these actions, as well as the acquiescence and assistance of others, these Defendants collectively deprived Plaintiffs of the rights secured to them by the Fourteenth Amendment to the Constitution of the United States.

273.     These Defendants acted in concert with C.S., Adam Sidote, and Julie Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint action theory.

274.     As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

275.     The conduct by these Defendants was willful, malicious, oppressive, and reckless, and it was of such a nature that Plaintiffs claim punitive damages against each of them in an amount commensurate with the wrongful acts alleged.

## FIFTH CAUSE OF ACTION

**Violation of the Fourth, Fifth, and Fourteenth Amendments
Abuse of Process under 42 U.S.C. § 1983
Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel,
Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman,
<u>C.S., Adam Sidote, Heather Sidote, and Julie Mudd</u>**

276.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 275 of this complaint as if fully set forth here.

277.    These Defendants committed an abuse of process by attempting to utilize

CPS and the process for reporting mistreatment and abuse of children to retaliate against

Plaintiffs because Tara and Daniel called these Defendants repeatedly attempting desperately to

locate their missing child and objected to these Defendants' efforts to prevent them from

speaking to Mya.

278.    These Defendants reported Tara and Daniel to CPS for the improper

purpose of causing harm to Plaintiffs due to Defendants' personal animus towards the Plaintiffs;

to harm the Plaintiffs' reputations; to deprive the Plaintiffs of their rights without affording the

Plaintiffs any opportunity to be heard; to cause further strife in Plaintiffs' family and create a

proceeding that these Defendants knew, or should have known, would be a long and difficult

process for Plaintiffs to obtain dismissal of; and to violate the Plaintiffs' rights secured by the

Constitution of the United States.

279.    These Defendants deprived Plaintiffs of the rights secured to them by the

Constitution of the United States.

280.    These Defendants acted in concert with C.S., Adam Sidote, and Julie

Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and

therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint

action theory.

281.    As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

282.    The conduct by Defendants was willful, malicious, oppressive, and reckless, and it was of such a nature that Plaintiffs claim punitive damages against each of them in an amount commensurate with the wrongful acts alleged.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**
**Violation of Due Process Right to Care and Custody of Child and**
**Right to Intimate Association under 42 U.S.C. §1983**
**Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel,**
**Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman,**
**C.S., Adam Sidote, Heather Sidote, and Julie Mudd**

283.    Plaintiff incorporates the allegations contained in paragraph 1 through 282 of this complaint as if fully set forth herein.

284.    Tara and Daniel have a constitutionally protected liberty interest in the care, custody, and management of their daughter, Mya, and the right to intimate association, and a substantial measure of sanctuary from unjustified interference from the State.

285.    Tara and Daniel have been deprived of said liberty interest without due process of law insomuch as these Defendants retaliated against them for taking issue with their negligent care and supervision of their daughter and ignoring and/or choosing not to investigate the evidence indicating that Mya was in grave danger each day without benefit of the care of her parents and, in the alternative, manifested contentious circumstances based on a falsified

44

allegations against Tara and Daniel and created coercive interference from the CPS, which ultimately resulted in Mya being repeatedly raped and abused until she was returned home.

286.    Upon information and belief, these Defendants understood and/or were aware that submitting a CPS report would likely not only delay Mya's return to her family but could result in a permanent loss of custody of Mya.

287.    Through his aforementioned actions and omissions, these Defendants deprived Tara and Daniel of their rights protected by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.

288.    These Defendants deprived Plaintiffs of their liberty interest without probable cause in violation of clearly established constitutional law, and no reasonable school board, police officer, or CPS worker would have believed that their actions were lawful.

289.    As a result of the unconstitutional conduct by these Defendants, Tara and Daniel were deprived of physical custody of their daughter, control over whether their daughter would continue school, or where she would go to school, control over their daughter's actions involving sex and drugs, and control over their daughter's safety and well-being.

290.    These Defendants acted in concert with C.S., Adam Sidote, and Julie Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint action theory.

291.    As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

292.     The conduct by these Defendants was willful, malicious, oppressive, and reckless, and it was of such a nature that Plaintiffs claim punitive damages against each of them in an amount commensurate with the wrongful acts alleged.

**SEVENTH CLAIM FOR RELIEF**

**VIOLATION OF FIRST, FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS**
**Failure to Intervene under 42 U.S.C. § 1983**
**Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel, Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman, C.S., Adam Sidote, Heather Sidote, and Julie Mudd**

293.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 292 of this complaint as if fully set forth herein.

294.     These Defendants failed to take reasonable steps to prevent their fellow officers, caseworkers, and school board members from engaging in the illegal acts alleged herein, though they were present at the scene of such violations and were capable of doing so.

295.     The actions by these Defendants violated Plaintiffs' constitutionally protected rights under the First, Fourth, Fifth, and Fourteenth Amendments.

296.     These Defendants knew, or reasonably should have known, that their conduct violated Plaintiffs' clearly established constitutionally protected rights.

297.     These Defendants acted with the intent to violate, or with deliberate or reckless indifference to, Plaintiff's clearly established rights under the First, Fourth, Fifth, and Fourteenth Amendment.

298.     These Defendants acted in concert with C.S., Adam Sidote, and Julie Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint

action theory.

299.    At all times relevant herein, these Defendants were acting under the color
of state or federal law.

300.    As a direct and proximate result of the foregoing, was damaged and
injured in an amount to be determined at trial.

301.    The aforesaid conduct by these Defendants was willful, malicious,
oppressive, and/or reckless and was of such a nature that Plaintiffs' claims punitive damages
against each of them in an amount commensurate with the wrongful acts alleged herein.


## EIGHTH CLAIM FOR RELIEF

**VIOLATION OF FIRST, FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS**
**Conspiracy to Violate Plaintiffs' Constitutional Rights**
**Against Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, David Benton, Mark Bechtel,**
**Ronald Smith, Dave Schneider, Katherine Van Lean, Christian Filipski, Evelyn Foreman,**
**C.S., Adam Sidote, Heather Sidote, and Julie Mudd**

302.    Plaintiffs incorporate the allegations contained in paragraphs 1 through
301 of this complaint as if fully set forth herein.

303.    By and through the actions described above, these Defendants, acting
under the color of state law, conspired to deprive Plaintiffs of their constitutional rights as
guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments of the United States
Constitution.

304.    These Defendants conspired amongst themselves to fabricate a story that
Tara and Daniel were not fit to care for Mya because, as concerned parents, they expressed their
frustration regarding the unreasonable deprivation of their daughter.

305.    These Defendants agreed to deprive Tara and Daniel of their constitutional rights and deprived them of their constitutional rights by physically preventing Tara and Daniel access to their daughter and then continuously hiding Mya to allow her to live in a location where she endured rape and abuse, thereby causing Plaintiffs pain and mental anguish, together with shock, fright, apprehension, embarrassment, and humiliation.

306.    These Defendants acted in concert with C.S., Adam Sidote, and Julie Mudd to violate Plaintiffs' rights and in furtherance of causing damages to the Plaintiffs, and therefore, these private actors may be held liable under 42 U.S.C. § 1983 pursuant to the joint action theory.

307.    As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

308.    The aforesaid conduct by these Defendants was willful, malicious, oppressive, and/or reckless and was of such a nature that Plaintiffs claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

**NINTH CAUSE OF ACTION**

**Violation of the First, Fourth, Fifth, and Fourteenth Amendment
Policy, Custom, and Practice of Defendants and
Failure to Supervise and Train under 42 U.S.C. § 1983
<u>Against the Town of Amherst</u>**

309.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 308 of this complaint as if fully set forth here.

310.    Defendant the Town of Amherst developed and maintained policies, customs, and practices exhibiting deliberate indifference to the Plaintiffs' parental rights.

311.    At all relevant times, defendant Town of Amherst was aware that defendants Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave Schneider were inadequately trained regarding the parental rights of parents under the First, Fourth, Fifth, and Fourteenth Amendments, yet defendant Town of Amherst maintained a policy or custom of failing to provide defendants Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave Schneider training on the First, Fourth, Fifth, and Fourteenth Amendments, parental rights, or adequate supervision over them.

312.    It was the policy or custom, or both, of defendant Town of Amherst to inadequately supervise and train its police officers, including defendants Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave Schneider, so it thereby failed to prevent the constitutional violations against Plaintiffs.

313.    Upon information and belief, defendant Town of Amherst maintained a policy, custom, or practice of interfering with Plaintiffs' parental rights and disregarding Plaintiffs' legitimate right to parent their child, Mya, in a way that they saw fit to remedy and rectify her rebellious behavior.

314.    Upon information and belief, defendant Town of Amherst maintained a policy, custom, or practice of interfering with Plaintiffs' parental rights with reckless disregard to the due process rights of Plaintiffs because the Town and its employees had personal animus towards Plaintiffs.

315.    Defendant Town of Amherst failed to properly screen and supervise defendants Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave Schneider, despite their duty to screen and supervise all Town employees.  The Town of Amherst retained or allowed defendants Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave

Schneider despite their history of inappropriate and unlawful acts that were documented by Town of Amherst and known by the appropriate policymakers who could rectify and change the behavior of those agents.

316.    Upon information and belief, Town of Amherst policymakers, including, but not limited to condoned and encouraged the inappropriate behavior by defendants Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave Schneider in an effort to retaliate against Plaintiffs for voicing their legitimate concerns.

317.    Defendant Town of Amherst's policies, customs, and practices demonstrate a deliberate indifference to the constitutional rights of persons within the Town of Amherst, including Plaintiffs, and it therefore caused the violation of Plaintiffs' rights.

318.     Defendant Town of Amherst ratified and acquiesced in the unlawful conduct of the other defendants, as is evidenced by the Town of Amherst's failure to discipline and/or correct the bad behavior of the other defendants.

319.    As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**

**Violation of the First, Fourth, Fifth, and Fourteenth Amendment
Policy, Custom, and Practice of Defendants and
Failure to Supervise and Train under 42 U.S.C. § 1983
Against the Amherst Central School District and
<u>Amherst Central School District Board of Education</u>**

320.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 319 of this complaint as if fully set forth here.

321.    Defendants Amherst Central School District and Amherst Central School District Board of Education developed and maintained policies, customs, and practices exhibiting deliberate indifference to the Plaintiffs' parental rights.

322.    At all relevant times, defendants Amherst Central School District and Amherst Central School District Board of Education were aware that defendants Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, Mark Bechtel, and David Benton were inadequately trained regarding the parental rights of parents under the First, Fourth, Fifth, and Fourteenth Amendments, yet defendants Amherst Central School District and Amherst Central School District Board of Education maintained a policy or custom of failing to provide defendants Gregory Pigeon, Scott Lawniczak, Heather Kystoiak, Mark Bechtel, and David Benton training on the First, Fourth, Fifth, and Fourteenth Amendments, parental rights, or adequate supervision over them.

323.    It was the policy or custom, or both, of defendants Amherst Central School District and Amherst Central School District Board of Education to inadequately supervise and train its employees and agents, including defendants Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, Mark Bechtel, and David Benton, so it thereby failed to prevent the constitutional violations against Plaintiffs.

324.    Upon information and belief, defendants Amherst Central School District and Amherst Central School District Board of Education maintained a policy, custom, or practice of interfering with Plaintiffs' parental rights and disregarding Plaintiffs' legitimate right to parent their child, Mya, in a way that they saw fit to remedy and rectify her rebellious behavior.

325.    Upon information and belief, defendants Amherst Central School District and Amherst Central School District Board of Education maintained a policy, custom, or practice

of interfering with Plaintiffs' parental rights with reckless disregard to the due process rights of

Plaintiffs because defendants Amherst Central School District and Amherst Central School

District Board of Education and its employees had personal animus towards Plaintiffs.

326.    Defendants Amherst Central School District and Amherst Central School

District Board of Education failed to properly screen and supervise defendants Gregory Pigeon,

Heather Kystoiak, Scott Lawniczak, Mark Bechtel, and David Benton, despite their duty to

screen and supervise all employees of the School District and Board of Education.  Defendants

Amherst Central School District and Amherst Central School District Board of Education

retained or allowed defendants Gregory Pigeon, Heather Kystoiak, Scott Lawniczak, Mark

Bechtel, and David Benton, despite their history of inappropriate and unlawful acts that were

documented by defendants Amherst Central School District and Amherst Central School District

Board of Education and known by the appropriate policymakers who could rectify and change

the behavior of those agents.

327.    Upon information and belief, policymakers of defendants Amherst Central

School District and Amherst Central School District Board of Education, including, but not

limited to, defendant Principal Gregory Pigeon, condoned and encouraged the inappropriate

behavior by defendants Heather Kystoiak, Scott Lawniczak, Mark Bechtel, and David Benton in

an effort to retaliate against Plaintiffs for voicing their legitimate concerns.

328.    Defendants Amherst Central School District and Amherst Central School

District Board of Education's policies, customs, and practices demonstrate a deliberate

indifference to the constitutional rights of individuals, including Plaintiffs, and it therefore

caused the violation of Plaintiffs' rights.

329.     Defendants Amherst Central School District and Amherst Central School District Board of Education ratified and acquiesced in the unlawful conduct of the other defendants, as is evidenced by defendants Amherst Central School District and Amherst Central School District Board of Education's failure to discipline and/or correct the bad behavior of the other defendants.

330.     As a direct and proximate result of the foregoing, Plaintiffs were damaged and injured in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress
### Against Defendants C.S., Adam Sidote, Heather Sidote, and Julie Mudd

331.     Plaintiff repeats and realleges paragraphs 1 through 330 of the complaint with the same force and effect as though fully set forth here.

332.     At all relevant times, it was the duty of these defendants and their agents to use reasonable care in the supervision and care of Plaintiffs' daughter, Mya.

333.     After defendants C.S., Adam Sidote, Heather Sidote, and Julie Mudd wrongfully deprived Tara and Daniel of access to their minor child, these defendants had a heightened duty owed to Plaintiffs that included a responsibility to protect their daughter, Mya, from harm.

334.     Defendants breached this duty by failing to keep Plaintiffs' daughter, Mya, safe from verbal, sexual, and physical abuse at the hands of C.S., as well as verbal abuse at the hands of Adam Sidote, Heather Sidote, and Julie Mudd.

335.    Defendants knew, or in the exercise of reasonable care, should have known, that their failure to properly supervise C.S. would subject Mya to sexual abuse.

336.    Defendants' acts, conduct, inaction, and omissions constituted negligence and breach of their duty to properly supervise and care for Plaintiffs' daughter, Mya, while she was in the care and custody of C.S. and his parents.

337.    Defendants' negligence caused emotional distress and physical injury to Mya, which in turn caused emotional distress to Mya's parents, Tara and Daniel.

338.    As a result of the foregoing, Tara and Daniel are entitled to an award of damages in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

339.    Defendants' conduct, action, inaction, or omissions were willful, despicable, knowing, and intentional, and accordingly, Tara and Daniel are entitled to an award of damages and punitive damages in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

## TWELFTH CAUSE OF ACTION

### Negligence
### Against Defendants C.S., Adam Sidote, Heather Sidote, and Julie Mudd

340.    Plaintiffs repeat and reallege paragraphs 1 through 339 of the complaint with the same force and effect as though fully set forth here.

341.    Defendants had a duty to take reasonable measures to protect Plaintiffs' daughter, Mya, from sexual harassment, including sexual assault and rape at the hands of their minor son, C.S.

342.    Defendants had a duty to investigate and resolve complaints of rape against their son to protect their minor-aged house guests and ensure their safety.

343.    Defendants had a duty to properly warn, train, and prevent their son from raping minor girls.

344.    Defendants had a duty to properly warn, train, and educate C.S.'s girlfriends about what constitutes rape and that such actions would not be tolerated in their household.

345.    Defendants breached their duty of care by, among other things, failing to conduct investigate Mya's complaints of rape and to protect her from C.S.

346.    Defendants breached their duty of care by, among other things, allowing defendant C.S. to come into contact with Mya while supplying them with drugs and alcohol.

347.    Defendants breached their duty of care by, among other things, failing to properly resolve Mya's complaint that she had been raped by C.S.

348.    Defendants' breaches of the standard of care directly and proximately caused injuries to Plaintiffs, which include, but are not limited to, severe emotional, psychological, and mental distress as a result of what Mya was forced to unnecessarily endure while living with the Sidotes.

349.    As a result of the foregoing, Plaintiffs are entitled to an award of damages in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

350.    Defendants' conduct as described above was willful, despicable, knowing, and intentional, and accordingly Plaintiffs are entitled to an award of damages and punitive

damages in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

## **DEMAND FOR JURY TRIAL**

351.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

## **PRAYER FOR RELIEF**

Plaintiffs pray for relief and demands judgment as follows:

1.     That Plaintiffs be awarded compensatory damages against all Defendants in an amount to be determined at trial;

2.     That Plaintiffs be awarded punitive damages against all Defendants in an amount to be determined at trial;

3.     That this Court, pursuant to 42 U.S.C. § 1988, issue an order awarding the Plaintiffs reasonable attorneys' fees, together with the costs of this action against all Defendants; and

4.     That this Court award such other further relief, together with any other legal or equitable relief, or both, as the Court deems just and proper.

**{Signature Page on Next Page}**

Dated:     June 3 2024
               Buffalo, New York

**RUPP PFALZGRAF LLC**
*Attorneys for Plaintiffs*

*s/Chad A. Davenport*
R. Anthony Rupp III, Esq.
Chad A. Davenport, Esq.
1600 Liberty Building
Buffalo, New York 14202-3694
Phone: (716) 854-3400
Rupp@RuppPfalzgraf.com
Davenport@RuppPfalzgraf.com
4861-2983-2602, v. 1

57