UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DANIEL J. RYAN, TARA M. KREUDER,       )
and MYA RYAN,                          )
                                       )
    Plaintiffs,                    )
                                       )
    v.                             )       Case No. 1:24-cv-536-GWC
                                       )
THE TOWN OF AMHERST, AMHERST           )
CENTRAL SCHOOL DISTRICT,               )
AMHERST CENTRAL SCHOOL                 )
DISTRICT BOARD OF EDUCATION,           )
GREGORY PIGEON, individually and in    )
his capacity as Principal of the Amherst )
Central School District High School,   )
HEATHER KYSTOIAK, individually and     )
in her capacity as Vice Principal of Students )
at the Amherst Central School District High )
School, SCOTT LAWNICZAK,               )
individually and in his capacity as a Vice )
Principal at the Amherst Central School )
District High School, DAVID BENTON,    )
individually and in his capacity as Guidance )
Counselor at the Amherst Central School )
District High School, MARK BECHTEL,    )
individually and in his capacity as School )
Resource Officer of the Amherst Central )
School District High School and Officer for )
the Town of Amherst Police Department, )
RONALD SMITH, individually and in his  )
capacity as a Detective for the Town of )
Amherst Police Department, DAVE        )
SCHNEIDER, individually and in his     )
capacity as a Detective for the Town of )
Amherst Police Department, KATHERINE   )
VAN LEAN[1], individually and in her   )
capacity as a Caseworker for the Erie  )
County Child Protective Services,      )
CHRISTINE FILIPSKI, individually and in )
her capacity as a Caseworker for the Erie )
County Child Protective Services, EVELYN )

---

[1] The Complaint misspells Katherine Van Lean's name as Katherine LaVean.

FOREMAN, individually and in her )
capacity as a Caseworker for the Erie )
County Child Protective Services, ADAM )
SIDOTE, JULIE MUDD, C.S., AND )
HEATHER SIDOTE, )
 )
  Defendants. )

## ORDER ON MOTIONS TO DISMISS
### (Docs. 16, 25, 26, 29)

Plaintiffs Daniel Ryan ("Mr. Ryan"), Tara Kreuder ("Ms. Kreuder"), and Mya Ryan

("Mya") bring this action against several employees of Amherst Central High School, Amherst

Central School District, and Amherst Central School District Board of Education ("School

District Defendants"); three Amherst Police Department employees and the Amherst Police

Department ("APD Defendants"); four employees of Erie County Child Protective Services

("CPS Defendants"); and four private individuals, Adam Sidote, Heather Sidote, Julie Mudd, and

C.S. ("Sidote Defendants"). Plaintiffs' claims arise out of Mya's decision to run away from the

home of her parents, Ms. Kreuder and Mr. Ryan, in May 2022. According to the Complaint,

Mya spent the majority of her three months away from home living with Adam Sidote, Julie

Mudd, and C.S. The Complaint alleges that Mya suffered horrific abuse while staying with Mr.

Sidote, Ms. Mudd, and C.S., and that the other defendants did nothing to investigate whether

Mya was safe and, to the contrary, interfered with Ms. Kreuder's and Mr. Ryan's attempts to

speak with Mya, reconcile with her, and bring her home.

The CPS Defendants (Doc. 16), the Sidote Defendants (Doc. 25), the School District

Defendants (Doc. 26), and the APD Defendants (Doc. 29) have each filed a motion to dismiss.

The parties have finished their briefing, and the court heard oral argument on November 3, 2025.

**Factual Background**

The court draws the following facts from the Complaint (Doc. 1). As required on a motion to dismiss, the court accepts these facts as true for the purposes of this opinion. *Trs. of Upstate N.Y. Eng'rs. Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

On May 23, 2022, plaintiff Mya Ryan—a teenager—ran away from home after her mother, plaintiff Tara Kreuder, confronted her because Ms. Kreuder believed she smelled marijuana coming from Mya's room. (Doc. 1 ¶¶ 28–30, 32.) The confrontation happened in the morning, and Ms. Kreuder assumed Mya had left for high school, not run away. (*Id.* ¶ 31.) When Ms. Kreuder realized that Mya never showed up for school and failed to return home, she called the Town of Amherst Police Department and reported Mya as a missing person. (*Id.* ¶ 33.)

On May 24, 2022, Mya went to school. (*Id.* ¶ 34.) Defendant Mark Bechtel, the school resource officer, and a Town of Amherst Police Department employee, saw Mya and spoke with her. (*Id.* ¶ 35.) Mya told both Officer Bechtel and her high school counselor, defendant Dave Benton, that she planned to return home after school and work. (*Id.*) A detective with the Town of Amherst Police Department called Ms. Kreuder and instructed her to file another missing person report if Mya did not return home that night. (*Id.* ¶ 36.) Because Mya did not return home, Ms. Kreuder filed another missing person report on May 25, 2022. (*Id.* ¶ 38.)

For several days, Mya stayed with different friends on a temporary basis. (*Id.* ¶ 39.) Not wanting to return home and unable to stay with any of her friends on a long-term basis, Mya asked defendants C.S., Adam Sidote, and Julie Mudd if she could stay in their home, and they

agreed.[2] (*Id.* ¶ 41.) C.S. was a 16-year-old boy. (*Id.* ¶ 46.) Mr. Sidote was C.S.'s father, and

Ms. Mudd was Mr. Sidote's girlfriend. (*Id.* ¶ 24.) Heather Sidote, C.S.'s mother, was no longer

in a relationship with Mr. Sidote and lived in a separate home. (*Id.* ¶ 27.) C.S. had behavioral

issues and had dropped out of school. (*Id.* ¶¶ 46–47.) His parents and Ms. Mudd struggled to

control his erratic and sometimes aggressive behavior. (*Id.* ¶¶ 48–49.)

The Complaint describes a "*quid pro quo* dynamic" in the Sidote home, in which Mya

could stay in the home only if she was C.S.'s girlfriend, acted as his caretaker, "and

accommodate[d] his demands, including sexually related demands that Mya was not interested in

accommodating." (*Id.* ¶ 51.) If Mya played this part, it would "quell the wild behavior of C.S.

and make him more manageable and easier to deal with for his parents." (*Id.* ¶ 52.) From late

May until August, when Mya returned home, she experienced sexual and verbal abuse in the

Sidote home. C.S. insisted that she sleep in his bed, repeatedly raped her, and surveilled her.

(*Id.* ¶¶ 56–70.) He went into the bathroom with her, encouraged her to skip school, and waited

for her in the school parking lot on days she attended school. (*Id.* ¶¶ 60–62, 67–70.) C.S.'s

parents were aware of C.S.'s abuse but did nothing to stop it and "went so far as to *encourage*

Mya to perform her role as C.S.'s caretaker and satisfying his sexual desires."[3] (*Id.* ¶ 54, 56, 58,

60–62, 68.) Though Heather Sidote did not live in the home, she was aware of her son's conduct

(*Id.* ¶ 61) and facilitated C.S.'s abuse of Mya by allowing the two teenagers to take unsupervised

---

[2] The Complaint does not explain how Mya knew C.S., Mr. Sidote, or Ms. Mudd or how
she came to stay with them.

[3] The Complaint alleges that Adam Sidote, C.S., and Julie Mudd have subjected at least
one other teenage girl to similar treatment when she ran away from home. That girl, identified as
N.D. in the Complaint, also stayed in the home on the condition of being C.S.'s girlfriend and
satisfying his sexual desires. The Sidotes encouraged N.D. to file for emancipation and helped
her with the process. (*Id.* ¶¶ 71–75.)

trips to Ms. Sidote's cabin in Canada and by allowing them to spend time unsupervised in Ms. Sidote's home in New York (*Id.* ¶¶ 200, 206). According to Mya and C.S., Ms. Sidote was aware that C.S. raped Mya and, on one occasion, "had a talk with [C.S.]" after he raped Mya. (*Id.* ¶¶ 220–21.)

Mya began staying with the Sidotes on Memorial Day weekend of 2022. (*Id.* ¶ 77.) She returned to school the following week. (*Id.* ¶ 78.) Her first day back, Principal Gregory Pigeon and several other teachers approached her to ask where she was staying. (*Id.*) Although Ms. Kreuder and Mr. Ryan contacted the school numerous times to ask about Mya's whereabouts, neither Principal Pigeon nor the teachers informed Mya that her parents had been trying to contact her, nor did they contact Ms. Kreuder and Mr. Ryan to inform them of their daughter's whereabouts. (*Id.* ¶¶ 79–82.)

That day, Mya's discussions with various school employees centered on why she did not want to return home rather than on her current living situation and whether it was safe. (*Id.* ¶¶ 81–88.) Specifically, school officials wanted to know if Mya had run away from home because of abuse; Mya had previously reported to Counselor Benton that her father physically abused her and that she had a "strained relationship with her parents." (*Id.* ¶¶ 83–88.) Counselor Benton had shared these reports of abuse with Principal Pigeon. (*Id.* ¶ 85.)

Mya's report of abuse to Counselor Benton concerned an incident that occurred on February 17, 2022. That day, Mya contacted the Amherst Police Department to report that her father pushed to her to ground during an argument about the fact that she had skipped school. (*Id.* ¶ 88.) When the police arrived, they found Mr. Ryan outside. (*Id.* ¶ 89.) When the officers asked him what happened, he explained that he and Mya had fought about her skipping school— an ongoing problem. He then explained that, during the fight, Mya started pointing her finger in

Mr. Ryan's face, and he responded by "grabb[ing] and restrain[ing] Mya" "to get her out of his personal space, and as a result she fell to the ground." (*Id.* ¶¶ 90–93.) The officers then spoke with Mya, who confirmed Mr. Ryan's account. (*Id.* ¶ 94.) The officers left the scene, and no charges were filed. (*Id.* ¶¶ 96–97.) As a result of the incident, a Child Protective Services ("CPS") report was filed. The agency's investigation determined that the allegations of abuse were "unfounded," meaning that "CPS did <u>not</u> find a fair preponderance of the evidence that [Mya] was abused or maltreated." (*Id.* ¶ 100) (alterations in original).

The week that Mya returned to school after Memorial Day weekend, Officer Bechtel approached Mya in the hallway and asked her what was going on at home. (*Id.* ¶ 101.) She responded that her parents kicked her out because she was vaping in the house and that she planned to go back home the next day. (*Id.* ¶¶ 102, 104.)

On June 1, 2022, Ms. Kreuder and Mr. Ryan called the Amherst Police Department to file another missing person report, as they still did not know where Mya was staying or whether she was safe. (*Id.* ¶ 106.) "[T]hey were met with snide comments and reluctance from the officers with whom they spoke." (*Id.*) Also on June 1, Ms. Kreuder called Amherst High School to ask if Mya was at school. (*Id.* ¶ 107.) When the school employee said, "no," Ms. Kreuder asked why no one had informed her that her daughter had not shown up at school that day despite the school's policy to call parents when their child was absent. (*Id.* ¶¶ 108, 110.) The employee responded that "it was not the school's responsibility to keep track of Mya's whereabouts." (*Id.* ¶ 109.)

Met with this resistance from Amherst High School and the police department, Ms. Kreuder and Mr. Ryan hired a private investigator, who determined that she was staying at the Sidote home. (*Id.* ¶ 111.) Upon learning where Mya was staying, her parents arranged a

meeting with her at Amherst Central High School on June 3 to discuss why she was not returning home.[4] (*Id.* ¶ 112.) They organized this meeting through Amherst Central High School employees. (*Id.* ¶ 113–14.) No school officials informed Mya that she would be meeting with her parents that day. (*Id.* ¶ 114.)

On June 3, Vice Dean of Students Heather Kystoiak pulled Mya out of class and told her that a detective with the Town of Amherst Police Department wanted to speak with her. (*Id.* ¶ 115.) She then took Mya to a conference room. (*Id.* ¶ 122.) When Ms. Kreuder and Mr. Ryan arrived for the meeting, they were met by Ms. Kystoiak, Counselor Benton, Officer Bechtel, and Amherst Police Department detectives Ronald Smith and Dave Schneider. (*Id.* ¶ 121.) They informed Ms. Kreuder and Mr. Ryan that Mya was in the conference room but that only Ms. Kreuder was allowed to go in and speak with Mya. (*Id.* ¶ 122.)

Upon learning that he was not allowed to see his daughter, Mr. Ryan "became irate and demanded to be able to go into the room and speak with Mya." (*Id.* ¶ 124.) Ms. Kreuder then stated she would not speak with Mya without Mr. Ryan because they were a family, and Mya's absence from home was a family issue. (*Id.* ¶ 125.) The situation became heated. (*Id.* ¶ 126.) Mr. Ryan, Ms. Kreuder, and the detectives had an angry exchange that escalated when Detective Smith waved his finger in Mr. Ryan's face. (*Id.* ¶ 127.) "The situation then spiraled out of control . . . ." (*Id.* ¶ 128.) Having decided that the detectives and school officials "were not there to help them," Ms. Kreuder left the building to wait for Mr. Ryan. (*Id.* ¶¶ 129–31.) As Mr. Ryan exited the building along with Officer Bechtel, the school went into lockdown. (*Id.* ¶ 131.) Officer Bechtel apologized to Mr. Ryan for how "it all happened." (*Id.*) When Ms. Kreuder

---

[4] At the November 3 hearing, Plaintiffs' counsel stated that the private investigator did not learn where Mya was staying until approximately mid-June and that any suggestion to the contrary in the Complaint was in error.

asked Officer Betchel who was picking Mya up from school, he responded that it was a "younger boy." (*Id.*)

Back inside the school, Counselor Benton, Ms. Kystoiak, and an Amherst Central School District official, Scott Lawniczak, went into the conference room to speak with Mya. (*Id.* ¶¶ 133–34.) Ms. Kystoiak apologized for the disturbance between Mya's parents and the school and police officials. (*Id.* ¶ 134.) Mr. Lawniczak then asked Mya for information about where she was staying, and she disclosed the address of the Sidote home and the names of the people she was staying with. (*Id.* ¶¶ 134–35.) Counselor Benton and Ms. Kystoiak then led Mya to a room where they locked her in and told her she was not allowed to leave for the rest of the school day. (*Id.* ¶ 136.) A CPS investigator, Evelyn Foreman, came to meet with Mya and spoke with her for about 15 minutes. (*Id.* ¶¶ 138–39.) The conversation was focused on whether Mr. Ryan physically abused Mya. (*Id.* ¶ 139.) Investigator Foreman asked Mya no questions about her living situation with the Sidotes or whether she was safe. (*Id.* ¶ 140.)

Still hoping to speak to their daughter that day, Ms. Kreuder and Mr. Ryan drove to the off-site location of the "BOCES" school program Mya attended because they knew she was scheduled to attend the program that day. (*Id.* ¶ 141.) When she did not arrive, they drove back to Amherst Central High School, assuming she had stayed there. (*Id.* ¶ 143.) They stayed in the parking lot where students are typically picked up, hoping to see Mya and speak with her. (*Id.*) While they were waiting, Principal Pigeon came out to the parking lot and "downplayed the entire incident" from earlier that day, "including putting the school on lockdown," which he said was "customary practice since they were in the hallway." (*Id.* ¶ 144.) Officer Bechtel then approached and "spoke with a different tone" than he had earlier, blaming Ms. Kreuder and Mr. Ryan for making the school go into lockdown, but Principal Pigeon interjected and said he had

already told Ms. Kreuder and Mr. Ryan that going into lockdown was standard practice. (*Id.* ¶ 144.)

Knowing that Ms. Kreuder and Mr. Ryan were waiting in the parking lot to speak with Mya, some number of Defendants, "including but not limited to Principal Pigeon, Detective Smith, and Detective Schneider," contacted the Sidotes and instructed them to pick Mya up in the school's back parking lot, where Mya's parents would not see whose car she got into. (*Id.* ¶ 145.) Principal Pigeon, Officer Bechtel, Detective Smith, and Detective Schneider escorted Mya to the back parking lot and walked her to C.S.'s car. (*Id.* ¶ 146.) Mr. Sidote was in his own car, around the corner. (*Id.* ¶ 148.) As Mya got into C.S.'s car, Principal Pigeon, Officer Bechtel, Detective Smith, and Detective Schneider asked her if her father had any firearms but asked her no other questions. (*Id.* ¶ 150.)

On June 6, 2022, Amherst Central School District Superintendent, Anthony Panella, wrote to Mr. Ryan and informed him that a no trespassing order had been issued banning him from the Amherst Central High School premises based on the events of June 3. (*Id.* ¶ 153.) Then, on June 8, 2022, Ms. Kreuder and Mr. Ryan received separate letters from CPS Investigator Foreman and her supervisor, Katherine LaVean, informing them that, "[o]n June 3, 2022, the New York Statewide Register of Child Abuse and Maltreatment (SCR) received a report alleging that you have abused or maltreated a child."[5] (*Id.* ¶ 154 (alteration in original).) The investigation was assigned to CPS and was led by Investigator Foreman, CPS Investigator Christine Filipski, and CPS Supervisor LaVean. (*Id.* ¶ 155.) The report was based on claims of "inadequate guardianship" and appeared to be unrelated to the earlier investigation of abuse in

---

[5] As discussed below, Plaintiffs believe the events on June 3 were the impetus for the CPS investigation.

February 2022. (*Id.* ¶ 159.) On June 17, 2022, Ms. Kreuder and Mr. Ryan received separate

letters stated that the CPS report resulted in "indicated" findings against them, meaning that

"CPS found a fair preponderance of evidence that [they] abused or maltreated [Mya]." (*Id.* ¶ 162

(second alteration in original).) These charges were ultimately dismissed by CPS more than a

year later, without ever holding a formal hearing. (*Id.* ¶ 163.)

CPS's investigation into the allegations of insufficient guardianship consisted of a single

video conversation with Adam Sidote about Mya's living situation with the Sidotes, which lasted

about 15 minutes. (*Id.* ¶ 164.) About a week after the attempted June 3 meeting, CPS

Investigator Foreman contacted Mr. Sidote saying she wanted to have a video call to discuss

Mya's living situation. (*Id.* ¶ 165.) In advance of the call, Mr. Sidote and Ms. Mudd instructed

Mya to throw her clothes on the floor of an unoccupied bedroom and hang clothes in the closet to

make it look like she was staying in her own room. (*Id.* ¶ 166.) Mya complied with these

instructions. (*Id.* ¶ 167.) During the video call the next day, Mr. Sidote showed Investigator

Formean the room that Mya was allegedly sleeping in. (*Id.* ¶ 171.) When Investigator Foreman

asked whether Mya was using drugs, Mr. Sidote lied and stated that she was not using drugs or

drinking alcohol. (*Id.* ¶ 170.) Investigator Foreman did not ask to speak with Mya. (*Id.* ¶ 169.)

During Mya's time living with the Sidotes, Mr. Sidote and Ms. Mudd helped Mya limit

contact with her parents. (*Id.* ¶ 179.) On or about June 13, 2022, with the help of Town of

Amherst Police Department officers, Mr. Sidote and Ms. Mudd convinced Mya to file for an

order of protection against Mr. Ryan, which they helped her complete and file. (*Id.* ¶ 180.) The

police officers helped convince Mya to file for the order of protection by saying it would allow

her to go home to get some of her belongings. (*Id.* ¶ 184.) The Erie County Family Court did

not issue the order of protection due to lack of evidence. (*Id.* ¶ 183.) Mr. Sidote and Ms. Mudd also contacted a lawyer in an effort to assist Mya in getting an emancipation order. (*Id.* ¶ 185.)

Mya abandoned her attempt to get an order of protection when she realized it would prevent her from attending her sister's wedding, which was scheduled for July 9. (*Id.* ¶¶ 187–88.) Ms. Kreuder, Mr. Ryan, and Mya's sister all texted Mya to inquire if she would attend the wedding, and Mya responded that she would. (*Id.* ¶ 189.) Mr. Sidote and Ms. Mudd tried to convince Mya that going to the wedding was a bad idea, but Mya maintained that she wanted to attend. (*Id.* ¶¶ 189–90.) C.S. and Mr. Sidote responded by insisting that they drive Mya to the wedding rather than allowing her family to drive her. (*Id.* ¶ 191.)

The wedding went smoothly, and Mya took a photo with her parents and sister to commemorate the event. (*Id.* ¶¶ 193–94.) Nevertheless, "brainwashed by C.S. and his parents, who told Mya that she would never be loved again by anyone else based on what C.S. had done to her, . . . Mya returned to the Walmart parking lot and got back into the car with Adam and C.S. and allowed them to take her back to the Sidote home." (*Id.* ¶ 195.) Mya continued to live with the Sidotes, where she suffered further verbal abuse and sexual violence, until the end of August, when Ms. Kreuder and Mr. Ryan "were able to send an officer over to retrieve their daughter and finally bring her back to safety."[6] (*Id.* ¶ 211.)

### Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff "must plead enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Chorches v. Am. Med.*

---

[6] The Complaint does not specify whether the unnamed officer was a law enforcement officer and, if so, if they were an officer of the Amherst Police Department. The Complaint does not explain why Ms. Kreuder and Mr. Ryan could not have an officer retrieve Mya at an earlier date.

*Response, Inc.*, 865 F.3d 71, 78 (2d Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  In evaluating a Rule 12(b)(6) motion, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Trs. of Upstate N.Y. Eng'rs.*, 848 F.3d at 566) (internal quotation marks omitted).  "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019) (alteration in original) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)).

### Qualified Immunity Standard

Some of the defendants raise the defense of qualified immunity in their motions to dismiss.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal citation and quotation marks omitted).  "[T]he law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal citation and quotation marks omitted).  "Because qualified immunity is an affirmative defense, '[i]t is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Linton v. Zorn*, 135 F.4th 19, 30–31 (2d Cir. 2025) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)) (alteration in original).

The Second Circuit has held that "usually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted," *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (cleaned up) (emphasis omitted), but "in appropriate circumstances a district court may address qualified immunity at the pleadings stage," *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (internal quotation marks and citation omitted). "[A] qualified immunity defense faces a formidable hurdle at the motion to dismiss stage and is usually not successful." *Id.* (cleaned up). "When a defendant presents a qualified immunity defense on a motion to dismiss . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* (internal quotation marks and citation omitted). "[A]s with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *McKenna*, 386 F.3d at 436 (quoting *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992).

## Analysis

The Complaint asserts ten federal claims and two state-law claims. The court begins by addressing the federal law claims.

Each of Plaintiffs' federal claims arises under 42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights, but instead "allows an action at law against a 'person who, under color of [law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 70 (2d Cir. 2023) (alterations in original) (quoting

42 U.S.C. § 1983). Here, Plaintiffs assert violations of their First, Fourth, Fifth, and Fourteenth Amendment rights. The court addresses each count of the Complaint in turn.[7]

## I.    First Amendment Retaliation (Count 1)

The Complaint brings a claim for First Amendment retaliation against Defendants Pigeon, Kystoiak, Lawniczak, Benton, Bechtel, Smith, Schneider, LaVean, Filipski, and Foreman. Plaintiffs allege that one or more of these defendants instigated the CPS investigation for inadequate guardianship in retaliation for Ms. Kreuder's and Mr. Ryan's criticisms of Defendants and their handling of Mya's situation on June 3, 2022. (Doc. 1 ¶ 236.)

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (first alteration in original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). To state a claim for retaliation in violation of the First Amendment "a plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took an adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir. 2025) (summary order) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). "Specifically, it must be a 'but-for' cause,

---

[7] The Complaint sets forth Plaintiffs' procedural due process claim before their substantive due process claim. Because the procedural due process claim depends on the success of the substantive due process claim, the court considers them in reverse order.

meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399.

None of the motions to dismiss assert that Plaintiffs' speech was unprotected.[8] And, for the purpose of their motion to dismiss, the Amherst Central High School Defendants concede that they took an adverse action against Plaintiffs. (*See* Doc. 26-1 at 9–11.) The court therefore focuses on the second element for the non-school defendants and third element for all Defendants.

## A.    Adverse Action – Non-School Defendants

In the First Amendment retaliation conduct, an adverse action is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). "Under this objective standard, an adverse action must be more than de minimis to support a First Amendment retaliation claim." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011). "[T]his test is highly context-specific," so, in cases like this one, courts "apply it 'in light of the special characteristics of the school environment.'" *Id.* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).

The Second Circuit has held that, when a student alleges that a school administrator reported abuse or neglect as retaliation for protected speech, such a report "is not an adverse action against [the student] as a matter of law" if there is "[no] evidence of retaliatory or punitive

---

[8] The Town and Amherst Police Defendants state in their motion to dismiss that "Plaintiffs' complaint fails to allege any protected activity or adverse action from the Town and Amherst Police Defendants." (Doc. 29-2 at 7.) Other than this brief reference to protected activity, the motion includes no argument that the speech was not protected. In the absence of any meaningful briefing on the issue, the court will not consider this argument. *Toberts v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (in general, arguments raised "in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

intent as to the child." *Cox*, 654 F.3d at 274.  However, when *parents* allege that a state actor reported abuse or neglect in retaliation for the *parents'* speech, such a report is an adverse action. *See Maco v. Baldwin Union Free Sch. Dist.*, 726 F. App'x 37, 39 (2d Cir. 2018) (treating report of suspected abuse as an adverse action for purposes of parent's First Amendment retaliation claim); *see also Abubakari v. Schenker*, No. 19-cv-510, 2021 WL 1617159, at *4 (D. Conn. Apr. 26, 2021) (knowingly filing a false report of neglect was "precisely the kind [of conduct]" that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights in parents' First Amendment retaliation claim).  The Complaint therefore alleges an adverse action taken by Defendants against Mya's parents.

Nevertheless, the CPS Defendants and the APD Defendants argue that the Complaint fails to plausibly attribute this adverse action to them specifically, as the Complaint merely alleges that "one or more of Defendants caused a CPS report for 'inadequate guardianship' to be issued." (Doc. 1 ¶ 233.)  The court will address this argument only as it relates to APD Defendants because, as explained below, Plaintiffs have failed to plausibly plead a retaliatory motive against CPS Defendants.

APD Defendants rely on *Myers v. Moore*, 326 F.R.D. 50 (S.D.N.Y. 2018) for the proposition that group pleading is impermissible.  That is, a plaintiff must specify which defendants engaged in which conduct and cannot attribute actionable conduct to "defendants" more generally.  In *Myers*, the plaintiff brought a claim for malicious prosecution against several police officers.  In her complaint, she did not specify which of the officers instituted the proceedings against her, instead alleging that "Defendants" engaged in each of the acts at issue. *Id.* at 55–56.  In dismissing an earlier version of the complaint and granting leave to amend, the court noted that "the proposed Amended Complaint does not plead facts demonstrating which

16

officer is responsible for the alleged malicious prosecution of Plaintiff, even though Plaintiff has access to the criminal complaint filed against her." *Id.* at 55 (cleaned up). The court then granted leave to amend "*on the condition* that [Plaintiff] name the officer *the officer responsible* for the alleged malicious prosecution, and *plead facts supporting that assertion*." *Id.* (emphasis original) (internal citation and quotation marks omitted).

This case is distinguishable. Unlike the plaintiff in *Myers*, Plaintiffs cannot know at this stage in the proceedings which Defendant or Defendants reported Ms. Kreuder and Mr. Ryan for inadequate guardianship. It is therefore reasonable for Plaintiffs to plead on information and belief that one or all Defendants participated in the report process. Exactly who did what is a matter for discovery.

### B.    Retaliatory Motive – All Defendants

To satisfy the third element of their prima facie case, Plaintiffs must allege facts supporting a causal connection between the CPS report and their protected speech. Here, Plaintiffs point to the temporal proximity between their protected speech and the report of inadequate guardianship, which occurred on the same day. Plaintiffs also argue that Defendants lacked a reasonable basis for suspecting inadequate guardianship.

As Defendants note, the Second Circuit has been hesitant to impose liability for retaliation where the alleged retaliatory act is a report of abuse or neglect by a mandatory reporter. As the court discussed in *Cox*, mandatory reporters must, by law, report suspected child abuse, leaving them in a position in which they could face liability if they do *not* report suspected abuse or neglect. 654 F.3d at 274–75. Thus, if such reports "could result in § 1983 liability, administrators would be exposed to civil liability no matter what they did." *Id.* at 274. The Second Circuit has therefore held that the court must exercise "unusual deference in the

abuse [and neglect] investigation context," *Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000)

(internal quotation marks and citation omitted).

To understand how to apply this "unusual deference," it is necessary to review the

relevant case law in some detail. The court begins with *Cox*, a case in which the defendants

allegedly retaliated against a student for his protected First Amendment speech. 654 F.3d 267.

The student, Raphael—who had previously engaged in extensive misbehavior at school,

including fighting with other students—wrote an essay for class in which he described himself

engaging in numerous unlawful acts and dying by suicide. *Id.* at 270. The teacher showed the

essay to the principal, who immediately pulled Raphael out of class and placed him in the room

used for detentions while he considered "whether Raphael posed an imminent threat to himself

or others, and whether he should be disciplined for his essay." *Id.* at 270–71. The principal

ultimately concluded that Raphael did not pose an immediate threat to himself or others and let

him leave. *Id.* at 271. The next day, the principal made a report of suspected neglect to Child

and Family Services ("CFS")[9] based on the "perception that the parents were insufficiently

concerned about Raphael's misbehavior and emotional well-being." *Id.*

The Second Circuit held that neither removing Raphael from class nor reporting his

parents to CFS constituted adverse actions for the purposes of First Amendment retaliation

because they were primarily protective in purpose, not punitive. With respect to the decision to

remove Raphael from class, the court held that, given the unusual deference owed to that

decision, "and absent a clear showing of retaliatory or punitive intent, it cannot be considered

'adverse' or 'retaliatory.'" *Id.* at 274. The court then held that, "[f]or the same reason,"—i.e.,

---

[9] While Plaintiffs in this case have sued Erie County Child Protective Services ("CPS"), New York has a statewide agency known as the Office of Children and Family Services ("CFS"), which was the relevant agency in *Cox*.

the deference owed to mandatory reporters—"[the principal's] decision to report Raphael's parents to CFS, without any evidence of retaliatory or punitive intent as to the child, is not an adverse action against Raphael as a matter of law" because such a report is "protective," rather than disciplinary. *Id.*

Giving attention to the precise circumstances and language used in *Cox*, the court notes the following:

- *Cox* concerned alleged retaliation against a student, not a parent. In explaining its holding, the court wrote: "[The principal] had a legal obligation to report suspected child neglect to CFS, an obligation arising precisely from his responsibility to keep his students safe. Allowing such reports to generally constitute retaliation against the *children* would seriously undermine school administrators' ability to protect the children entrusted to them." *Id.* at 275 (emphasis original).

- There was no evidence of retaliatory motive in *Cox*.

- The court's language about the absence of "a clear showing of retaliatory or punitive intent" was with respect to removing Raphael from class, not with respect to the CFS report.

- *Cox* was decided on summary judgment.

With those considerations in mind, the court turns to *Maco v. Baldwin Union Free School District*, 726 F. App'x 37 (2d Cir. 2018), in which the Second Circuit faced a situation analogous to the one in this case. In *Maco*, the plaintiff alleged that a school employee reported her for abuse of her minor daughter in retaliation for a complaint that the plaintiff made about a school employee's treatment of the plaintiff's daughter. In assessing the mother's claim for First Amendment retaliation, the court provided the following statement of the law:

> Recognizing that we owe 'unusual deference' to school administrators who are required by law to report suspected child abuse (or 'mandated reporters'), we have held that, absent a 'clear showing of retaliatory or punitive intent,' *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 274 (2d Cir. 2011) (internal quotation marks omitted); *see* N.Y. Soc. Serv. Law § 413(a), where the administrator has 'a sufficient basis to suspect potential abuse,' *Oglesby v. Eikszta*, 499 F. App'x 57, 60 (2d Cir. 2012) (summary order), the report is, as a matter of law, not retaliatory, *Dole v. Huntington Union Free Sch. Dist.*, 699 F. App'x 85, 87 (2d Cir. 2017) (summary order).

*Id.* at 39. *Maco*, like *Cox*, was decided on a motion for summary judgment.

The Second Circuit reached a similar decision in *Dole v. Huntington Union Free School District*, 699 F. App'x 85 (2d Cir. 2017) (summary order), where a mother alleged that the school reported suspected abuse in retaliation for her complaints about bullying at the school.  In that case, the court explained that, "[i]f the school officials who called CPS have a 'sufficient basis to suspect potential abuse,' we owe '"unusual deference"' to their 'decision[s] to report reasonably suspected abuse and neglect.'" *Id.* at 87 (quoting *Oglesby v. Elikszta*, 499 F. App'x 57, 60 (2d Cir. 2012) (quoting *Cox*, 654 F.3d at 274)).  The court then held that, because "the[] facts gave school officials a 'sufficient basis to suspect potential abuse,' and there is no 'clear showing of retaliatory or punitive intent,' the call to CPS was not retaliatory and defendants are entitled to summary judgment on that basis." *Id.* (quoting *Oglesby*, 499 F. App'x at 60; then quoting *Cox*, 654 F.3d at 274).  *Dole*, like *Maco* and *Cox*, was decided on summary judgment— as was *Oglesby*, an analogous case cited in both *Dole* and *Maco*.

*Cox* did not address a *parent's* allegation of First Amendment retaliation.  With respect to reports of abuse and neglect, it addressed only whether and when such reports can constitute an adverse action against a *student* for the *student's* speech.  *Dole*, *Maco*, and *Oglesby* do not expressly address these differences and quote *Cox*'s language regarding the removal of a student from class in their statements of law on reports of neglect and abuse.

The court's reasoning in *Cox* actually does support the holdings in *Dole*, *Maco*, and *Oglesby*, notwithstanding their differences. To meet the causation element of a First Amendment retaliation claim, retaliatory intent must be a but-for cause of the adverse action. *Nieves*, 587 U.S. at 399. Because mandatory reporters *must* report suspected abuse and neglect, it is, as a general matter, reasonable to assume that, even where there is some evidence of retaliatory motive, such motive was not a but-for cause of the report because the reporter *also* had a reasonable and sufficient basis to suspect abuse or neglect. Further, *Cox* grants unusual deference to mandatory reporters because of the liability they would face for failing to report suspected abuse or neglect and because preventing child abuse and neglect is an extremely important governmental interest. Without such deference, mandatory reporters would be discouraged from reporting suspected abuse or neglect. Thus, when a mandatory reporter reasonably suspects neglect or abuse, liability should not attach unless there is clear evidence that the reporter was in fact motivated by retaliatory intent rather than the duty to report. The logic of this rule applies equally to retaliation against a parent or a student.

This formulation suggests a two-step inquiry: First, a court must determine whether the reporter *reasonably* suspected abuse or neglect—i.e., whether there was an objectively reasonable basis for making the report. If not, then a parent alleging retaliation need not make any heightened showing of causation. If there *was* an objectively reasonable basis for making the report, the court must proceed to the second step of the inquiry and determine if, nevertheless, the parent has presented clear evidence that the reporter would not have taken the adverse action but for their retaliatory motive.

This inquiry will necessarily look different at the motion-to-dismiss stage, an issue the Second Circuit has not yet addressed. Of course, a court must accept the facts alleged in the

21

complaint as true and must draw reasonable inferences in the plaintiff's favor. But it is perfectly possible that, even at the pleading stage, the facts alleged will show that a mandatory reporter had a reasonable suspicion of neglect or abuse. In such cases, the court must determine what, precisely, the plaintiffs must plead with respect to causation in order to survive a motion to dismiss.

Few plaintiffs will be able to allege facts that clearly demonstrate retaliatory intent at the pleading stage. That inability does not mean that discovery will not yield clear evidence of retaliatory intent. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 506–07 (2002) (recognizing that a plaintiff without direct evidence of discriminatory intent at the pleading stage may uncover such evidence during discovery). But it must be plausible that the plaintiff will be able to come forth with such evidence. A plaintiff in such a case must therefore plead facts that support the reasonable inference that the defendant acted with retaliatory intent; if it is plausible that the defendant acted with retaliatory intent, it is also plausible that discovery will uncover evidence to further support with specificity a "clear showing" of that intent.

Beginning with the first step of the analysis, Defendants argue that they had a sufficient basis to suspect Mr. Ryan of child abuse. (*See* Doc. 26-1 at 10; Doc. 29-2 at 14.) But the report to CPS did not allege suspected abuse; it alleged inadequate guardianship and was lodged against both Mr. Ryan and Ms. Kreuder. (Doc. 1 ¶ 159.) The question is therefore whether Defendants had a sufficient basis for suspecting Mr. Ryan and Ms. Kreuder of inadequate guardianship.

The New York Office of Child and Family Services defines inadequate guardianship as follows:

> This term applies to the overall quality of care the parent or other person legally responsible provides the child(ren). Guardianship is inadequate if it fails to meet a minimum standard of care for the child within the commonly accepted societal norms. Inadequate guardianship results in actual physical or developmental harm

22

to the child, or imminent danger of such harm.  Inadequate guardianship includes, but is not limited to:

- Continually allowing a child to remain away from home for extended periods of time without knowledge of the child's whereabouts.

- Making demands beyond the child(ren)'s physical or emotional abilities which results in harm or imminent danger of harm to the child.

- Exploitation of the child(ren) by a spouse in marital or custodial disagreements, or litigation disputes which results in specific harm or imminent danger of harm to the child.  Litigation itself is not sufficient to show inadequate guardianship (see **Emotional Neglect**).

- Exposing, exploiting, or encouraging the child to participate in illegal and/or immoral acts.

- Leaving a child(ren) in the care of another person without establishing a plan for the provision of adequate food, clothing, education or medical care.

- Providing constant surveillance of the child and limiting activities to the extent these actions result in harm or imminent danger of harm to the child.

N.Y. Office of Child & Fam. Servs., *New York State Child Protective Services Manual* E-31–E-32 (2025).

Accepting the facts alleged in the Complaint as true, Defendants did not have a sufficient basis for suspecting inadequate guardianship.  The Complaint alleges that Ms. Kreuder and Mr. Ryan actively wanted to reconcile with Mya and bring her home and that Defendants knew as much.  To the extent that Defendants viewed Ms. Kreuder's and Mr. Ryan's failure to bring home their runaway daughter to be evidence of inadequate guardianship, the Complaint strongly suggests that Defendants in no way thought that failure was causing Mya actual developmental or physical harm—a requirement for a finding of inadequate guardianship.  Of course, Plaintiffs allege that Mya *was* experiencing serious developmental and physical harm, but the question now is whether Defendants had sufficient reason to suspect inadequate guardianship.  The

alleged facts demonstrate that they never considered that Mya might be unsafe with the Sidotes. None of the alleged facts support a reasonable suspicion of inadequate guardianship.

Because, at this stage in the litigation, the Complaint does not support a reasonable suspicion of inadequate guardianship, Plaintiffs need not make a heightened showing of retaliatory intent. The facts they have alleged are sufficient to meet this lighter burden. According to the Complaint, Mya ran away on or about May 23, 2022 (Doc. 1 ¶¶ 28–33), and Defendants were able to speak with her on or about May 24, 2022 (*Id.* ¶ 34). Counselor Benton spoke with Mya about why she ran away the week after Memorial Day weekend. (*Id.* ¶ 86.) Defendants were required by law to report any suspected abuse, neglect, or inadequate guardianship at that point. Yet Defendants did not make a report to CPS until June 3, the same day that Ms. Kreuder and Mr. Ryan attempted to meet with Mya and expressed their discontent with Defendants' handling of the situation. *See Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011) ("A plaintiff can establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse . . . action" (cleaned up)); *see also Abubakari v. Schenker*, No. 19-cv-510, 2021 WL 1617159, at *4 (D. Conn. Apr. 26, 2021) (plaintiff plausibly pled retaliatory intent where complaint of neglect was made five weeks after protected speech). Additionally, Defendants lodged the complaint against both Mr. Ryan *and* Ms. Kreuder, even though the Complaint supports the inference that Defendants were only concerned about Mr. Ryan's treatment of Mya. Together, these allegations support an inference of retaliatory intent.

Finally, the court must address CPS Defendants' argument that the Complaint fails to support a reasonable inference of retaliatory motive against them because they were not present on June 3, 2022, when Ms. Kreuder and Mr. Ryan expressed their discontent with the School

District Defendants and APD Defendants. (*Id.* at 16.) A defendant need not necessarily have witnessed the protected speech to retaliate against a plaintiff for that speech. In this case, it is reasonable to infer that that APD Defendants and Amherst Central School District Defendants informed CPS investigator Evelyn Foreman about the altercation with Ms. Kreuder and Mr. Ryan before having her speak with Mya on June 3. Thus, the same reasoning applies to all Defendants. At this early stage, Plaintiffs' allegations of retaliatory intent are sufficient.

### C.    Qualified Immunity

Though the Second Circuit did not find evidence of retaliation in *Cox*, the case nevertheless clearly established that it is unconstitutional to intentionally retaliate against someone for their protected speech by filing a report of abuse or neglect. The case stands for the proposition that the courts owe "unusual deference" to mandatory reporters, but it also acknowledges that, in some circumstances, a report of abuse or neglect can be retaliatory. After *Cox*, it should have been obvious to any mandatory reporter that the law does not permit them to make reports of abuse or neglect for the purpose of chilling First Amendment speech rather than to protect a child.

As discussed above, the facts alleged in the Complaint support an inference of retaliatory intent. If Plaintiffs can adduce evidence to clearly support their claim of retaliatory intent, Defendants will not be entitled to qualified immunity. It would therefore be premature to dismiss Plaintiffs' claim of First Amendment retaliation on the basis of qualified immunity at this stage.

## II.    Substantive Due Process (Counts 3 and 6)

Count 3 of the Complaint alleges that Defendants violated Plaintiffs' Fourteenth Amendment substantive due process right "to care and control the upbringing" of their daughter

Mya. (Doc. 1 ¶ 257.) Similarly, Count 6 alleges a violation of Plaintiffs' "protected liberty interest in the care, custody, and management of their daughter, Mya, and the right to intimate association" under the First and Fourteenth Amendments. (*Id.* ¶ 284.)

"[T]he analysis as to . . . intimate association and to substantive due process . . . is coextensive." *Doe v. Lima*, 270 F. Supp. 3d 684, 701 (S.D.N.Y. 2017). "As the Second Circuit has explained, '[t]he source of the intimate association right has not been authoritatively determined,' in that the Supreme Court has considered claims as to this right in connection with both the First Amendment and the Fourteenth Amendment's Due Process Clause." *Id.* (quoting *Adler v. Pataki*, 185 F.3d 35, 42–43 (2d Cir. 1999)). Thus, "[t]he Second Circuit has analyzed this right using the framework of substantive due process because the Supreme Court has described the right as a 'fundamental element of personal liberty.'" *Id.* (citing *Patel v. Searles*, 305 F.3d 130, 135–38 (2d Cir. 2002)). The court will therefore address Counts 3 and 6 together as substantive due process claims.

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Matzell v. Annucci*, 64 F.4th 425, 436 (2d Cir. 2023) (internal quotation marks and citation omitted). "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "To succeed on a substantive due process claim a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Matzell*, 64 F.4th at 436 (internal quotation marks and citation omitted).

Here Ms. Kreudal and Mr. Ryan invoke their constitutional rights as parents. A parent's interest "'in the care, custody, and management of their child' is a 'fundamental liberty interest protected by the Fourteenth Amendment.'" *Cox*, 654 F.3d at 275 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)); *see also Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (citing cases). "Family members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Cox*, 654 F.3d at 275 (cleaned up). The right of parents to direct the upbringing of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

Defendants assert that Plaintiffs' substantive due process claim must fail because they did not interfere with Plaintiffs' parent-child relationship, such that the court need not even determine if Defendants' alleged conduct "shocks the conscience." In making this argument, Defendants focus on the fact that Mya voluntarily ran away from home and chose not to return.

The court begins by addressing the argument of the Amherst Central School District Defendants and the CPS Defendants that there can be no substantive due process claim because no state actor deprived Ms. Kreuder and Mr. Ryan of their custody over Mya. These Defendants cite to various cases that, according to Defendants, stand for the proposition that parents cannot bring a claim for violation of their parental substantive due process rights without a showing that the state deprived the parents of custody. For instance, the Amherst Central School District Defendants rely on the following quote from *Cox*: "Where there is no actual loss of custody, no substantive due process claim can lie." 654 F.3d at 276.

*Cox* and the other cases cited by Defendants all involved situations in which the parents brought substantive due process *custody* claims. In *Cox*, the Second Circuit repeatedly referred

to the plaintiff's claim as "a claim for a violation of th[e] substantive due process right of custody." *Id.* at 275. Similarly, in *Oglesby*, the plaintiff-parents' claim was based on the right to intimate association with their children—i.e., physical custody of their children—not their right to the control or management of their children. 499 F. App'x 57. Because the parents sought to vindicate their right to intimate association and because the school district's report to children's services did not result in even a temporary loss of custody or removal of the children from their home, the plaintiffs' substantive due process claim was deficient.

The CPS and Amherst Central School District Defendants view parents' substantive due process rights too narrowly. As the Supreme Court has often stated, parents have a liberty interest in not just custody of their children but also the companionship, care, and management of their children. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting the liberty interest of parents "in the care, custody, and management of their child[ren]"); *Troxel*, 530 U.S. at 66 (recognizing "the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (holding that parents have a liberty interest "in the companionship, care, custody, and management" of their children). Loss of custody is not, therefore, an essential element of a parent's substantive due process claim. Parents have brought successful due process challenges where government actors have interfered with parents' right to control who visits with their child, *Troxel*, 530 U.S. 57; their right to be in the physical presence of their child, even where legal custody is not affected, *Doe v. Lima*, 270 F. Supp. 3d 684 (S.D.N.Y. 2017) (parole officers violated plaintiff's substantive due process right by depriving him of physical access to his son); and their right to control the religious upbringing of their children, *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

Still, as the Amherst Police Defendants correctly note, although the alleged interference need not be with a parent's legal custody, there must be *some* state interference with the parent-child relationship. Furthermore, "[w]hile the Second Circuit has never decided the issue, 'other Circuits, as well as numerous district courts within this Circuit, have declined to find that a parent's constitutional rights are violated unless the state action was aimed at specifically interfering with the parent-child relationship.'" *Sandoval v. Abbott House*, 782 F. Supp. 3d 203, 208 (S.D.N.Y. 2025) (quoting *Castro v. Windham*, No. 1-16-cv-8148, 2017 WL 4676644, at *4 (S.D.N.Y. Sept. 19, 2017) (collecting cases)).

In this case, Ms. Kreuder and Mr. Ryan allege that Defendants interfered with their parental rights by: (1) refusing to disclose and actively concealing Mya's location; (2) restricting Ms. Kreuder's and Mr. Ryan's access to their daughter; (3) filing a CPS complaint against them; (4) "declaring an emergency" to justify the disruption in custody; and (5) failing to properly investigate whether Mya was safe living with the Sidotes. For the moment, the court will consider the potential liability of School District Defendants, APD Defendants, and CPS Defendants. Then, the court will address the potential liability of Sidote Defendants.

## A. School District, APD, and CPS Defendants

### 1. Direct Interference with the Parent-Child Relationship

The court begins with the allegations that Defendants refused to disclose Mya's location and restricted Ms. Krueder's and Mr. Ryan's access to their daughter. Those allegations pertain to the School District Defendants and the APD Defendants but not to the CPS Defendants.

The court begins by reviewing two cases that shed light on the issue at hand. First, in *Leontiev v. Corbett School District*, 333 F. Supp. 3d 1054 (D. Or. 2018), the court considered whether state actors had interfered in a parent-child relationship where a 15-year-old transgender

29

boy referred to as F.V. ran away from his mother's—the plaintiff's—home because he felt that she was not supportive of his gender identity. F.V. sent an email to his mother explaining why he was not returning home. F.V. was a student at Corbett High School at the time of the events in question. He was also involved in the Corbett Performing Arts Club (CPAC). Although CPAC met at various high schools in the district and always had at least one district staff member present, it was not funded by the district.

The night that F.V. left home, his mother reported him as a missing person. That same night, Defendant Church, a schoolteacher at Corbett Middle School who was involved in the CPAC, filed a report with the Department of Human Services (DHS) alleging that the plaintiff and her husband emotionally abused F.V., an allegation which was ultimately found to be unsubstantiated. In the days after F.V. left home, he stayed with various friends and adults from the CPAC community. At one point, F.V. and several of these students and parents met with F.V.'s attorney. The attorney advised that F.V. should not stay with any given family for too long so they would not be liable for harboring a runaway.

During the majority of the time F.V. was away from home, his mother was apprised of his whereabouts. On some occasions, F.V. directly informed his mother where he was staying. At other times, the adults with whom he was staying or DHS would relay the message. When the plaintiff complained to the school superintendent that school employees were allowing F.V. to stay with them, the superintendent advised the staff not to allow F.V. to stay with them. A few days after F.V. ran away from home, his mother went to the home where he was staying to speak with him. With the assistance of a police officer and the adult with whom F.V. was staying, the plaintiff convinced F.V. to return home.

On these facts, the court found that no state official had interfered with the plaintiff's constitutional parental rights. The court emphasized that no state acter had coerced F.V. to leave home; he left entirely of his own volition. *Id.* at 1064–65. As the court put it, by the time the various defendants offered F.V. refuge or advice, "the alienation between F.V. and Plaintiff" had already arisen. *Id.* at 1065. The court also noted that, early during F.V.'s absence, the plaintiff indicated that she did not want F.V. to return home. *Id.* at 1066. Finally, the court noted that the plaintiff had presented no evidence "that a Defendant who actually knew of F.V.'s whereabouts refused to disclose them to Plaintiff when asked" and that there was no evidence that the plan to have F.V. stay at different homes each night was developed "to prevent Plaintiff from contacting her son." *Id.* The court summarized:

> [T]here is uncontradicted evidence that: (1) the parent-child relationship was already strained; (2) Defendants made attempts, either through F.V. or DHS, to keep Plaintiff apprised of . . . F.V.'s whereabouts; and (3) Defendants at no time prevented F.V. from returning home. Given the legal principles identified above, such actions cannot be said to "shock the conscience" or "offend the community's sense of fair play and decency." Plaintiff has thus not been deprived of her right to raise and associate with her child.

*Id.* at 1067. At the same time, the court recognized that, "[d]epending upon the age and maturity of the child and the nature of the parent-child conflict, there may be cases where a school employee's failure to take affirmative steps to reunite children with their parents amounts to negligence that 'shocks the conscience' and therefore violates substantive due process." *Id.* at 1066.

By contrast, *Mark N. v. Runaway Homeless Youth Shelter*, 733 N.Y.S. 2d 566 (N.Y. Fam. Ct. 2001), concerned a state-established shelter where runaway youth could stay for a period of 30 days. A father whose daughter ran away challenged the state's interpretation of the statute governing the shelter as barring the father from filing a habeas petition to bring his daughter

home during the initial 30-day period. The court, while recognizing the interests of the child in having a safe place to which she could run away, held that the state's reading of the statute did not adequately protect parents' constitutional rights. That is, although the daughter affirmatively chose to leave home and further chose not to *return* home, the state had interfered with the parent-child relationship by preventing the plaintiff from seeing his daughter or attempting to reconcile with her. Furthermore, that interference violated the father's substantive due process rights. The court ultimately held that, because one of the statute's purposes was, in fact, reconciling parents and their runaway children, it should be read to allow the father to file a habeas petition to bring his daughter home.

As in *Leontiev* and *Mark N.*, the Complaint in this case does not allege that anyone coerced Mya into leaving home. But the Complaint does allege that School District Defendants and APD Defendants actively and intentionally impeded Ms. Kreuder's and Mr. Ryan's attempts to reconcile with their daughter and bring her home. In contrast to *Leontiev,* when Ms. Kreuder and Mr. Ryan repeatedly called the school inquiring about Mya's whereabouts, no one informed them where Mya was staying, even though school officials directly asked Mya where she was staying the week after Memorial Day. (Doc. 1 ¶¶ 78–79.) Nor did they allow Ms. Kreuder and Mr. Ryan to speak with Mya on the phone. Additionally, when Mya's parents went Amherst Central High School to meet with Mya on June 3, School District Defendants and APD Defendants informed Mr. Ryan he could not see or speak with his daughter. According to the Complaint, school officials then kept Mya from attending her BOCES program that day so her parents would not be able to see or speak with her, then instructed Mya to leave school through the back parking lot so she would not have to see her parents. School District Defendants also

issued a no trespassing order against Mr. Ryan, preventing him from making future attempts to talk and reconcile with Mya on the school's property.

These actions go beyond the conduct alleged in *Leontiev*, where the defendants kept the plaintiff appraised of her son's whereabouts and where the plaintiff was allowed to speak with her son to convince him to come home—and even had the help of a police officer and one of the defendants in convincing F.V. to go home. It does not reach the level of *Mark N.*, however, where the defendant had complete control over whether the plaintiff could see his daughter and denied him that access. Instead, this case falls somewhere in the middle. For at least 10 days,[10] only Defendants knew where Mya was staying, and they kept that information from Ms. Kreuder and Mr. Ryan. Defendants then limited Ms. Kreuder's and Mr. Ryan's ability to see and reconcile with their daughter in the one location where they knew they could find her. Courts in this circuit have previously held that banning a parent from school property implicates that parent's constitutional right to the care, control, and custody of their child. *Johnson v. Perry*, 140 F. Supp. 3d 222, 229 (D. Conn. 2015), *reversed in part on other grounds*, *Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017). Although the relationship between Mya and her parents was already strained, Plaintiffs have plausibly alleged that School District Defendants and APD Defendants interfered with the parent-child relationship.

### 2.    Increased Risk of Harm to Parent-Child Relationship

The court now considers the extent to which the public defendants interfered with the parent-child relationship by increasing the risk of harm to Mya. The court focuses on: (1) the

---

[10] The Complaint suggests that Mya's parents learned she was at the Sidote home on June 2, 10 days after Mya ran away from home. (*See* Doc. 1 at ¶ 112.) At the hearing on this motion, however, Plaintiffs' counsel stated that Mya's parents did not learn where she was until approximately mid-June.

CPS investigation into Ms. Kreuder and Mr. Ryan; (2) the allegations of a cursory inquiry into the safety of the Sidote home; (3) the decision to tell Adam Sidote and C.S. to pick Mya up from the back parking lot; and (4) the Amherst Police Department's actions in attempting to convince Mya to file for an order of protection against her father.

The court begins by reviewing *Zubko-Valva v. County of Suffolk*, 607 F. Supp. 3d 301 (E.D.N.Y. 2022), a case that likewise concerned a claim that state actors were responsible for the harm a minor child suffered while under the care of a private actor.

In *Zubko-Valva*, the plaintiff, Justyna Valva, was divorced from her husband, Michael Valva. Although Ms. Valva was originally awarded temporary custody of the children during the divorce, the court granted custody to Mr. Valva after the guardian ad litem reported that Mrs. Valva was interfering with the guardian ad litem's access to the children. Thereafter, Mr. Valva started making false accusations of abuse against Ms. Valva with Child Protective Services (CPS), allegations which the children denied. Meanwhile, Mr. Valva and his girlfriend, Ms. Pollina, were subjecting the three young children to terrible abuse. Mr. Valva and Ms. Pollina engaged in excessive physical punishment, deprived the children of food to the point that they lost significant weight, and regularly punished them by making them sleep in an unheated garage. Ms. Valva reported this abuse to CPS.

Although there was ample evidence of Mr. Valva and Ms. Pollina's abuse, and no evidence that Ms. Valva abused the children, CPS quickly closed the investigation into Mr. Valva and Ms. Pollina and decided to prosecute a neglect case against Ms. Valva. Even when disturbing evidence from the children's school prompted the family court judge to order CPS to once again investigate Mr. Valva, the investigation was cursory, and the children remained in the custody of Mr. Valva and Ms. Pollina. Less than 10 days after CPS closed out the report against

Mr. Valva, he and Ms. Pollina punished one of the children by forcing him to sleep in the garage. It was January, and the child died from exposure.

In evaluating the failure-to-protect claim, the court began by noting that, although Mr. Valva's and Ms. Pollina's actions clearly "shock[ed] the contemporary conscience[,] . . . 'as a general matter a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause' even if state actors 'may have been aware of the dangers that the individual faced' from specific private actors." *Id.* at 310 (cleaned up) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 201 (1989)). "Rather, private violence can only form the basis of a substantive due process claim in two scenarios: (1) where 'the state had a special relationship with the victim' that gave rise to an obligation to protect him from the private violence and (2) where the state actor 'in some way had assisted in creating or increasing the danger to the victim.'" *Id.* (quoting *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008)).

The court distinguished Ms. Valva's situation from the one presented in *DeShaney*, where the Supreme Court rejected the substantive due process claim of a child whose father had beaten him so badly that he was permanently disabled. Although the Department of Social Services (DSS) had been alerted to possible serious abuse on prior occasions, it had taken no action. The Supreme Court concluded that, although state intervention would have prevented further abuse to the child, DSS was not liable because it put the child in no worse a position than he would have been in had no one contacted DSS at all.

By contrast, in *Zubko-Valva*, CPS did more than just fail to act. In addition to ignoring credible allegations of abuse against Mr. Valva, CPS prosecuted *Ms.* Valva for neglect despite inadequate evidence to justify such a prosecution. CPS therefore engaged in "preferential

treatment of Mr. Valva," and, "[c]rucially, Mr. Valva was aware of the disparate treatment he

and Mrs. Valva were receiving from CPS." *Id.* at 313.  The court ultimately concluded that one

could "plausibly infer that the CPS Defendants' 'affirmative conduct' in pursuing the neglect

petition against Mrs. Valva 'enhanced the danger to [her children] because they conveyed to' . . .

Mr. Valva that, no matter what they would learn about Mr. Valva, only Mrs. Valva would remain

in their crosshairs." *Id.* (first alteration in original) (quoting *Okin v. Vill. of Cornwall-On-*

*Hudson Police Dep't*, 577 F.3d 415, 430 (2d Cir. 2009)).  Finally, the court identified the critical

difference between Ms. Valva's case and *Deshaney*:

> To be clear, what distinguishes this case from *DeShaney* is not Mr. Valva's
> knowledge that CPS was not moving against him despite the evidence of his abuse
> they possessed.  Joshua's father must have also possessed such knowledge in
> *DeShaney*.  Rather, what is different here is that Mrs. Valva's allegations plausibly
> demonstrate that CPS took affirmative actions that demonstrated to Mr. Valva, not
> only that they had information implicating him that they were not acting on, but
> also that, even with the evidence they possessed, they had effectively concluded
> that Mrs. Valva, not him, was the guilty party in this ordeal.  Knowing this, Mr.
> Valva could logically conclude that he did not risk serious repercussions from his
> and Ms. Pollina's continued and intensifying abuse of his children.  Thus, Mrs.
> Valva plausibly alleges that "state officials communicate[d] to a private person that
> he or should [would] not be arrested, punished, or otherwise interfered with while
> engaging in misconduct that is likely to endanger the life, liberty or property of
> others."

*Id.* (alterations in original) (quoting *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005)).

The court in *Eubanks v. Hansell*, No. 22-cv-6277, 2024 WL 1308672 (E.D.N.Y. Mar. 26,

2024) was faced with similar facts.  In that case, two brothers, ages four and six, lived with their

mother and her boyfriend.  When the brothers' daycare center reported suspected abuse because

of physical signs of injuries, Children's Services interviewed the children, the mother, and the

boyfriend.  The defendants allegedly observed signs of physical injuries and learned that the

boyfriend had a history of domestic violence involving children, yet the defendants allowed the

children to stay with the mother and boyfriend.  After a follow-up home visit, the defendants

once again determined that the children were in a suitable living situation. About two weeks later, the boyfriend picked up one of the brothers and threw him violently to the ground, killing him.

On these factual allegations, the court held that the defendants had not increased the danger to the children but had merely failed to act. The court reasoned that the defendants never told the boyfriend "that he could act with impunity or assured [him] that he would not be impeded or arrested." *Id.* at *8 (internal quotation marks and citation omitted). Nor did the defendants have affirmative knowledge that the children's injuries were inflicted by the mother or her boyfriend. The defendants never "openly expressed camaraderie with [the boyfriend] and contempt for [the children]" in the face of an admission of abuse by the boyfriend. *Id.* (second alteration in original) (quoting *Okin,* 577 F.3d at 430). And they did not "condon[e] the misconduct over the course of several months." *Id.* (quoting *Pena,* 432 F.3d at 110–11).

In many ways, this case resembles *Zubko-Valva.* As in that case, CPS Defendants allegedly conducted only a cursory inquiry into the safety of the Sidote home but pursued a complaint for "insufficient guardianship" against Ms. Kreuder and Mr. Ryan, which resulted in an "indicated" finding only two weeks after the investigation was opened. (Doc. 1 ¶ 162.) According to the facts alleged in the Complaint, the School District Defendants and APD Defendants also signaled to the Sidotes that they had "effectively concluded that [Ms. Kreuder and Mr. Ryan] . . . w[ere] the guilty part[ies] in this ordeal," by instructing the Sidotes to pick Mya up in the back lot so she could avoid her parents; by instigating the CPS investigation into Ms. Kreuder and Mr. Ryan; and, in the case of the APD Defendants, encouraging Mya—in tandem with the Sidotes—to seek an order of protection against her father.

Nevertheless, the case at hand is more similar to *Eubanks* in one important respect: the Complaint in this case includes no allegations to support the inference that the School District Defendants, APD Defendants, or CPS Defendants knew Mya was being abused in the Sidote home. No one complained that the Sidotes were abusing or mistreating Mya in any way. Plaintiffs did not request an investigation into the conditions in the Sidote home. This case is thus falls far short of the starkly differential treatment at issue in *Zubko-Valva*. Defendant's behavior did not condone the abuse taking place in the Sidote home because Defendants were not aware of that abuse, and Defendants' actions thus gave the Sidotes no reason to believe that, if allegations of abuse were brought against them, Defendants would turn a blind eye. So, as in *Eubanks*, the alleged facts do not support the inference that CPS Defendants', APD Defendants', or School District Defendants' actions made Mya even less safe than if they had not acted at all.

In sum, Plaintiffs have plausibly alleged that School District Defendants and APD Defendants directly interfered in the parent-child relationship but have failed to plausibly allege that Defendants interfered in that relationship by increasing the risk of harm to Mya. The court therefore turns to the question of whether School District Defendants' and APD Defendants' conduct shocks the conscience.

### 3.    "Shocks the Conscience"

To constitute a violation of Plaintiffs' Fourteenth Amendment rights, the alleged conduct must "shock the contemporary conscience." *Matzell*, 64 F.4th at 436 (internal quotation marks and citation omitted). "The Supreme Court has not clearly defined the parameters of behavior that can be said to 'shock the conscience," *Briggs v. County of Monroe*, 293 F. Supp. 3d 379, 390 (W.D.N.Y. 2018), but "negligently inflicted harm 'is categorically beneath the threshold of constitutional due process,' whereas the intentional infliction of injury is the conduct 'most likely

to rise to the conscience-shocking level,'" *Matican*, 524 F.3d at 158 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). "In between those extremes is conduct exhibiting 'deliberate indifference' to harm, which can support a due process claim depending on the specific circumstances." *Briggs*, 293 F. Supp. 3d at 390 (citing *Lewis*, 523 U.S. at 850). "Deliberate indifference that shocks in one environment may not be patently egregious in another," and "due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Lewis*, 532 U.S. at 850. In the context of a Fourteenth Amendment due process claim, "deliberate indifference . . . can be shown by something akin to recklessness, and does not require proof of malicious or callous state of mind." *Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019).

In this case, the court must consider whether APD Defendants' and School District Defendants' alleged conduct in concealing Mya and preventing her parents from speaking with her "shocks the conscience." In the context of parent-child relationships, the court must keep in mind that "[t]he constitutional privileges attached to the parent-child relationship . . . are hardly absolute." *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005). Rather, parents' "interest in their family integrity . . . is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Id.* (internal quotation marks and citations omitted). It is thus "beyond dispute that the state has a substantial range of authority to protect the welfare of children." *Leonhard v. Mitchell*, 473 F.2d 709, 713 (2d Cir. 1973). As noted above, mere negligence cannot shock the conscience, but deliberate indifference, which "can be shown by something akin to recklessness," *can* shock the conscience. *Charles*, 925 F.3d at 86.

39

In *Leonhard v. Mitchell*, Second Circuit has held that a state actor's decision to conceal the whereabouts of a plaintiff's children for an extended period of time does not shock the conscience when the state actor believes it is necessary "to protect the children from serious harm or even death." *Leonhard*, 473 F.2d at 714. In that case, the plaintiff, Thomas Leonhard, was divorced from his wife, Rochelle Calabrese. In the divorce, Ms. Calabrese was granted custody of the couple's three children. Mr. Leonhard was granted visitation rights. Ms. Calabrese remarried. Her new husband was subsequently arrested for charges related to organized crime and agreed to testify against various organized crime members on the condition that the government protect him, Ms. Calabrese, and the children. Defendant Thomas Kennelly, an employee of the Justice Department, created new identities for the family and moved them to a new, secret residence. As a result, Mr. Leonhard lost all contact with his children. Mr. Kennelly refused Mr. Leonhard's requests for information about his children's whereabouts and would not arrange for Mr. Leonhard to see his children at a secure location. Ms. Calabrese indicated to Mr. Kennelly that she would create new identities for the family again and abscond if he revealed the children's whereabouts to Mr. Leonhard.

Ultimately, the Second Circuit concluded that Kennelly had rationally exercised his discretion and that no constitutional violation had occurred. In reaching that holding, the court noted that Ms. Calabrese "had legal custody of the children and believed that their safety from threatened violence required that they no longer be visited by their natural father"; that a government report confirmed these fears; and that Kennelly's refusal to disclose the location of the Calabrese family was based on his sense of obligation to them, both because of the promise he made to keep their identities and location a secret and because he believed the family would be in danger if he disclosed their location. *Id.* at 714. Thus, "rather than having abused a

discretionary power which he held, [Kennelly] acted in good faith in attempting to balance to competing interests: Thomas Leonhard's natural wish to be reunited with his children, and Rochelle Calabrese's equally natural desire to protect the children from serious harm or even death." *Id.*

This case is distinguishable from *Leonhard.* Here, Defendants had some reason to suspect that Mya was in danger at home, given her past allegations of abuse by Mr. Ryan. But, accepting the facts alleged in the Complaint as true, CPS determined that the allegations of abuse that Mya made in February 2022 were unfounded, and there is nothing in the Complaint indicating that Mya renewed her allegations of abuse after she ran away. Nor was there reason to believe that allowing Mr. Ryan to speak with Mya during a supervised meeting at her school would put her in danger.

Despite having little basis for their suspicions of abuse, Defendants refused to assist Ms. Kreuder or Mr. Ryan or to disclose Mya's location when they repeatedly called the school trying to locate Mya. (Doc. 1 ¶¶ 78–79.) As a result, Ms. Kreuder and Mr. Ryan did not know where their daughter was or whether she was safe for at least 10 days.[11] During that time, Ms. Kreuder and Mr. Ryan could not care for their daughter, control her upbringing, or make meaningful attempts to bring her home. Further, Defendants prevented Mr. Ryan from attempting to reconcile with his daughter on June 3.

While some courts have found that relatively short separations of a parent and child do not constitute a violation of substantive due process, those cases involved situations in which

---

[11] The Complaint suggests that Mya's parents learned she was at the Sidote home on June 2, 2022, 10 days after Mya ran away from home. (*See* Doc. 1 at ¶ 112.) At the hearing on this motion, however, Plaintiffs' counsel stated that Mya's parents did not learn where she was until approximately mid-June.

state actors believed that the children were in imminent and serious danger from their parents, and in each case the parents knew where their children were and that they were safe. *See Callahan*, 90 F. Supp. 3d at 71–72 (three-day separation of parent and child before court affirmed the defendants' decision to remove the child from the parent's home did not violate substantive due process); *Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 549 (E.D.N.Y. 2013) (finding that a six-day separation of parent and child did not violate substantive due process rights); *E.D. ex. rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 368 (S.D.N.Y. 2010) (no substantive due process violation where children were removed on a Friday and judicial proceedings commenced on the following Monday).

Instead, this case more closely resembles *Mark N.*, where the runaway child may have had understandable reasons for running away from home but where no apparent emergency justified depriving the parent of his right to the care and control of his child. In that scenario, even a 30-day waiting period before the father could file for habeas corpus would have violated his due process rights.

*Bano v. United States*, 788 F. Supp. 3d 408 (E.D.N.Y. 2025) also provides helpful guidance. In that case, a 16-year-old girl, referred to as F.B., was visiting Pakistan with her family. Her parents were born in Pakistan, and F.B. was also born in Pakistan, though she moved to the United States with her family when she was young. During the trip, F.B. became afraid that her family planned to make her stay in Pakistan and enter into an arranged marriage. She contacted the U.S. consulate in Pakistan for help, and the consulate helped F.B. by secretly extricating her from Pakistan and getting her on a flight back to the United States. As part of the extrication operation, F.B. separated from her family while at a shopping mall and connected with consulate employees. Her family believed she had been kidnapped but learned from mall

security footage that F.B. had left the mall with consulate officials. *Id.* at 414–15. When F.B.'s parents contacted State Department officials attempting to ascertain F.B's whereabouts, the government provided no information, instead suggesting to F.B. that she tell her parents where she was. F.B. declined to do so. *Id.* F.B.'s parents only managed to learn where she was 18 days after their inquiry to the State Department. *Id.*

While "applaud[ing] [the government's] sensible and rational behavior in erring on the side of caution in secretly extracting F.B." from Pakistan without first notifying her parents, the court held that "the Government's keeping the whereabouts of the Plaintiffs' child a secret once she was safely in the United States does raise at least a serious procedural due process issue." *Id.* at 421. By that point, the emergency had abated, and "[s]urely, the Government could have notified the Plaintiffs of their daughter's whereabouts and that she was safe once she was out of harm's way." *Id.*

Though the court here is concerned with substantive due process, not procedural due process, the situation in *Bano* and the court's reasoning in that case is analogous to the situation here. Mya was no longer living at home—and, therefore, no emergency existed—when Defendants decided to conceal Mya's whereabouts and prevent her parents from attempting to reconcile with her. Revealing her whereabouts would not have placed her at imminent risk of harm. Furthermore, according to the facts alleged in the Complaint, Defendants had no reason to believe that an emergency *had* existed when Mya was at home or that, if she were still there, CPS would have grounds to remove her from her parents' custody on an emergency basis. Except in the most serious circumstances, minors remain with their parents during the pendency of a CPS investigation. That fact emphasizes the strength of parents' rights to care for and control their child, even when their fitness is currently in question. Yet, in a situation in which

Mya had allegedly expressed no fear of returning home and reported no current abuse by her father, Defendants allegedly used their position of power to prevent Ms. Kreuder and Mr. Ryan from finding or speaking with their runaway daughter. At this stage in the proceedings, Plaintiffs' allegations give rise to a reasonable inference of deliberate indifference to Ms. Kreuder's and Mr. Ryan's constitutional parental rights.

### 4.    Qualified Immunity

School District Defendants, APD Defendants, and CPS Defendants seek dismissal of this claim on the basis of qualified immunity. Because none of the conduct by CPS Defendants violated Plaintiffs' substantive due process rights, as established above, the court focuses on whether School District Defendants and APD Defendants are entitled to qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal citation and quotation marks omitted). "[T]he law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal citation and quotation marks omitted). "Because qualified immunity is an affirmative defense, '[i]t is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Linton v. Zorn*, 135 F.4th 19, 30–31 (2d Cir. 2025) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)) (alteration in original).

The Second Circuit has held that "usually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted," *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (cleaned up) (emphasis omitted), but "in appropriate circumstances a district court may address qualified immunity at the pleadings stage," *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (internal quotation marks and citation omitted). "[A] qualified immunity defense faces a formidable hurdle at the motion to dismiss stage and is usually not successful." *Id.* (cleaned up). "Where a defendant presents a qualified immunity defense on a motion to dismiss . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* (internal quotation marks and citation omitted). "[A]s with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *McKenna*, 386 F.3d at 436 (quoting *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)).

At this stage in the proceedings, the court cannot say that APD Defendants and School District Defendants are entitled to qualified immunity on Plaintiffs' substantive due process claim. Drawing all reasonable inferences in Plaintiffs' favor, Defendants allegedly intentionally interfered with Plaintiffs' parent-child relationship based on a largely unfounded suspicion that Mr. Ryan had physically abused Mya at some point. Though Defendants did not take custody of Mya, it is notable that, "[w]ith respect to substantive due process rights, state seizure of children is constitutionally permitted only where 'case workers have a "reasonable basis" for their findings of abuse.'" *Southerland v. Giuliani*, 4 F. App'x 33, 36 (2d Cir. 2001) (quoting *Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999)). Here, when most of the relevant alleged

actions by the Defendants occurred, there was no finding of abuse or neglect *at all*, much less a reasonable one, yet Defendants allegedly interfered with the parent-child relationship. Qualified immunity is not appropriate at this time.

### B.    Sidote Defendants

Plaintiffs also seek to hold Sidote Defendants liable for violation of their parental right to the care, custody, management, and companionship of their daughter.[12] Sidote Defendants argue that they were not acting under color of state law and, therefore, cannot be held liable for a constitutional violation.

Under § 1983, "constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014). Thus, before analyzing Plaintiffs' individual claims, the court considers the Sidote Defendants' argument that Plaintiffs have failed to plausibly allege that they were acting "under color of state law" for the purposes of § 1983 liability. Insofar as Plaintiffs bring Fourteenth Amendment challenges against these defendants, the Second Circuit has observed that, "in a § 1983 action brought against a state official, 'the statutory requirement of action "under color of state law" and the "state action" requirement of the Fourteenth Amendment are identical.'" *Barrett v. Harwood*, 189 F.3d 297, 301 (2d Cir. 1999) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 929 (1982)).

---

[12] Most of the allegations against Sidote Defendants pertain only to Adam Sidote, Julie Mudd, and C.S. In their Motion to Dismiss, Sidote Defendants argue that the court must dismiss all of the § 1983 claims against Heather Sidote due to lack of personal involvement. Because the court dismisses all of the federal claims against Sidote Defendants on other grounds, the court does not address whether Heather Sidote was personally involved in the alleged constitutional violations.

"For the purposes of a § 1983 action, private parties act under color of state law if (1) the state compelled the private party's conduct, (2) the private party acted jointly with the state, or (3) the private party fulfilled a role that is traditionally a public function performed by a state. *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 221 (E.D.N.Y. 2010) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "A private party also acts under color of state law if it conspires with state actors to deprive someone of his or her constitutional rights." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). Here, Plaintiffs contend that the joint action exception applies and, further, that the Sidote Defendants conspired with the other defendants to violate Plaintiffs' constitutional rights. Because Plaintiffs bring a separate claim for conspiracy to violate their constitutional rights, the court will, for the moment, focus on whether a variety of actions alleged in the Complaint raise a plausible inference of "joint action."

"The touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the government." *Mumin v. City of New York*, 760 F. Supp. 3d 28, 66–67 (S.D.N.Y. 2024) (cleaned up) (quoting *DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 69 (E.D.N.Y. 2019)). Put differently, "[a] private actor can only be a willful participant in joint activity with the State or its agents if the two share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014).

Here, Plaintiffs argue that Sidote Defendants were engaging in joint activity with the other defendants when they: (1) concealed Mya; (2) picked Mya up from the back parking lot; (3) convinced Mya to file for an order of protection; and (4) deceived CPS about Mya's living situation. (Doc. 30 at 26–27.) The court will address each in turn.

With respect to concealing Mya, nothing in the Complaint suggests that Sidote Defendants actively concealed Mya's whereabouts at their home from Ms. Kreuder and Mr. Ryan. This argument cannot, therefore, be a basis for state action on the part of Sidote Defendants.

Plaintiffs also fail to plausibly plead that Adam Sidote and C.S. were acting under color of state law when they picked Mya up from the back parking lot. "[A] private actor does not act under color of state law merely by communicating or cooperating with a state actor . . . ." *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 113 (N.D.N.Y. 2023). Rather, the private actor must take a "more active role." *Id.* (internal quotation marks and citation omitted). For example, in *Jeanty*, "in addition to willingly participating in joint action with [state defendants]," the private defendant, "exerted influence over Sciortino, another state actor, and thus was acting under color of state law." *Id.* at 114. Here, the facts alleged in the Complaint suggest that Mr. Sidote and C.S. were merely cooperating with the school's request, not taking a "more active role" in the decision to keep Mya from encountering her parents that day.

Plaintiffs next contend that the Sidotes engaged in joint action with state officials when they convinced Mya to file for an order of protection against Mr. Ryan. Even assuming that Sidote Defendants acted under color of state law when they convinced Mya to file the order of protection, these actions cannot be the basis for liability under the substantive due process clause because the Sidotes' actions did not interfere with Plaintiffs' parent-child relationship; although Mya filed for an order of protection, it was not granted.

Finally, Plaintiffs contend that "Adam Sidote coordinated with CPS Investigator Foreman to deceive CPS about Mya's living situation." (Doc. 30 at 27.) The facts alleged in the Complaint do not support the inference that Mr. Sidote "coordinated with CPS Investigator

Foreman." Rather, even viewed in the light most favorable to the Plaintiffs, the alleged facts demonstrate that Mr. Sidote deceived Investigator Foreman, not that he acted in concert with her to deceive other CPS officials. According to the Complaint, Mr. Sidote and Ms. Mudd instructed Mya to put her clothes in the closet of a spare bedroom and throw some of her clothes on the floor to make it look like she was staying in her own bedroom. During Mr. Sidote's video call with Investigator Foreman, he showed Investigator Foreman that room and claimed that Mya was staying in that room by herself. Mr. Sidote then falsely told Investigator Foreman that Mya was not using drugs or alcohol.

It is true that, in some circumstances, "a private citizen can be found to have acted under color of state law . . . when he . . . knowingly provides state actors with false information, to induce them to act." *Grinols v. Beers*, 532 F. Supp. 3d 95, 107 (W.D.N.Y. 2021). That fact pattern typically arises with respect to claims for false arrest or malicious prosecution, where the false accusations of a private party directly impelled the police to act. For instance, in *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 722 (S.D.N.Y. 2012), the court held that, "by offering false information to state authorities, [the private defendants] invoked the power of the state intentionally to cause the plaintiffs' arrest."

Many courts in this Circuit, however, have declined to find state action when a private party supplied false information to the police. As the court in *Carrillos v. Incorporated Village of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015) explained, "it is only when a private actor takes a more active role and jointly engages in action with state actors, that he will be found to have acted under color of state law for purposes of Section 1983." Thus, merely "summoning" police officers or providing them with information, "even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint

action." (*Id.*) "[I]f a police officer's actions are due to the officer's own initiative, rather than the directive of a private party, the private party will not be deemed a state actor." *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011). By contrast, "[a] longstanding pattern of repeated lies and false accusations made for the purpose of procuring an arrest may constitute state action," as such a pattern might put the police on notice of the false nature of the accusations such that the private and state actors can properly be said to be acting "jointly." *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 221 (E.D.N.Y. 2010).

Here, the allegations in the Complaint are insufficient to support a plausible inference of joint action. Adam Sidote deceived Investigator Foreman, but he did not compel her decision to forgo further investigation. According to the facts alleged in the Complaint, Investigator Foreman also had no reason to know that Mr. Sidote was lying to her, so the court cannot infer that she and Mr. Sidote were acting on some implicit agreement.

The court will therefore GRANT Sidote Defendants' Motion to Dismiss (Doc. 25) with respect to Plaintiffs' substantive due process claim.

## III.    Procedural Due Process (Count 2)

Plaintiffs bring a claim for a violation of procedural due process under the Fourteenth Amendment against all of the non-institutional defendants. Their claim rests on the allegation that Defendants failed to provide any pre- or post-deprivation hearing before deciding to conceal Mya and otherwise prevent Ms. Kreuder and Mr. Ryan from reconciling with Mya. (Doc. 1 ¶¶ 244–246.)

To state a claim for a violation of procedural due process, a plaintiff must allege "(1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). As

outlined above, Plaintiffs have adequately alleged that APD Defendants and School District

Defendants deprived them of a liberty interest. Because CPS Defendants were not involved in

the decisions leading to that alleged deprivation and because Sidote Defendants were not acting

under color of state law, the court considers only the potential liability of APD Defendants and

School District Defendants for deprivation of Plaintiffs' procedural due process rights.

The Supreme Court has outlined the general factors a court must consider in deciding

what procedures must be afforded to a party before the government deprives them of a

constitutional right:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement
> would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In this case, the private interest is Ms. Kreuder's and Mr. Ryan's right to care for and

control Mya. As discussed above, School District Defendants and APD Defendants allegedly

interfered with Plaintiffs' parent-child relationship by refusing to disclose where Mya was

staying and preventing Mr. Ryan from speaking with his daughter. For a period of at least

10 days, Plaintiffs had no way to connect with their daughter without the help of School District

Defendants and APD Defendants. Theoretically, of course, Mya could have come home

voluntarily or responded to her parents' calls, but the same was true in *Mark N.*, 733 N.Y.S. 2d

566, discussed above, where a child ran away to a state-sponsored home for runaway children.

In both this case and in *Mark N.*, the state effectively controlled a parent's ability to see,

reconcile with, and bring home their child. And "[g]overnment actions that restrict a parent's

contact with his child implicate fundamental rights." *Graham v. City of New York*, 869 F. Supp.

2d 337, 349 (E.D.N.Y. 2012). Further, with respect to Mr. Ryan's banishment from school property, at least one court in this circuit has held that "[b]anning a parent from his child's public school infringes upon the parent's constitutional liberty interest in directing the education of his child." *Johnson*, 140 F. Supp. 3d at 229.

The court must next consider the risk of an erroneous deprivation and the probable value of additional procedural safeguards. Because, as Defendants point out, no one deprived Ms. Kreuder and Mr. Ryan of legal custody over Mya, the court must look beyond the standards that the Second Circuit has articulated regarding cases in which a state actor removes a child from a parent's custody in the interests of the safety of the child. Instead, Defendants allegedly interfered with Ms. Kreuder's and Mr. Ryan's ability to reconcile with Mya and bring her home. And they allegedly made these decisions without providing Ms. Kreuder or Mr. Ryan an opportunity to be heard.

As discussed above, Defendants allegedly acted on the suspicion that Mr. Ryan was abusing Mya. Those suspicions were informed by Mya's past reports of abuse. At the same time, CPS had previously investigated Mr. Ryan and found no evidence of abuse. According to the Complaint, Mya had made several remarks to Defendant Benton about abuse and mistreatment in the past, but she did not renew those complaints after she ran away. In fact, she at one point told Defendant Betchel that she was kicked out of the house because her parents caught her vaping. As indicated in *Kia*, 235 F.3d at 761, acting on mere suspicions of mistreatment, rather than on a reasonable belief, can create a high risk of an erroneous deprivation. ("Had Kia P. been held at the Hospital solely for the purposes of protecting the child from possible abuse or improper parental care for the entire ten days during which parent and child were kept apart, without a hearing and a court order permitting their enforced

separation, there is a serious danger that the Hospital defendants would have violated the plaintiffs' procedural due process rights."). *See also Walston v. City of New York*, No. 22-CV-10002, 2024 WL 1376905, at *7–8 (S.D.N.Y. Mar. 7, 2024) (holding that refusal of hospital to discharge newborn, even though it did not result in separation of parent and child, violated the mother's due process rights because the decision was based on mere suspicions of abuse).

Providing additional process could have lowered the risk of erroneous deprivation. The court recognizes that School District Defendants and APD Defendants were still in the process of gathering information about the risk to Mya and why she had run away from home. But the law in this area acknowledges the strength of parents' rights during an ongoing investigation of abuse and the need to minimize the risk of an erroneous deprivation of those rights. Only in emergency situations may the state take custody of a child without providing a pre-deprivation hearing. In turn, to "show that emergency circumstances existed, '[t]he government must offer objectively reasonable evidence that harm [was] imminent." *Southerland v. City of New York*, 680 F.3d 127, 150 (2d Cir. 2012) (quoting *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991)). Again, the court recognizes that custody was not at stake in this case, but, based on the facts alleged in the Complaint, there was simply no evidence of an emergency indicating the need to deny Ms. Kreuder and Mr. Ryan information about and access to their daughter without first engaging in some sort of process.

Turning to the burden on the government, the court recognizes that schools must constantly make decisions about the safety and wellbeing of children, often involving potential risks posed by parents themselves. Schools could not function if forced to have formal hearings each time they had to balance a student's needs and interests with those of the student's parents. Even providing parents with the opportunity to meet with administrators any time a school made

a decision that somehow interfered with the parent-child relationship would likely prove too burdensome. Furthermore, schools must have the ability to regulate who comes onto school grounds and on what conditions. Otherwise, the school could not maintain order and safety on campus. In fact, some courts in other circuits have held that it does not violate a parent's due process right to direct the education of their children to ban them from school grounds for this very reason. *See, e.g., Zeyen v. Pocatello/Chubbuck Sch. Dist. #25*, No. 16-cv-458, 2018 WL 2224053, at *5 (D. Idaho May 18, 2018) (collecting cases).

Nevertheless, at least one court in this circuit has held that, "[a]lthough the State has authority to restrict school access to ensure a safe and productive environment, it may not so significantly prohibit an individual parent from normal school access without affording the parent a fundamentally fair opportunity to contest the State's asserted reasons for doing so." *Johnson*, 140 F. Supp. 3d at 229. And this case differs in an important respect from those that have found no violation of due process where a school has banned a parent from the premises: the right at issue here is the right to the care, custody, and management of one's child, not the right to direct the child's education.[13] In the case of a runaway, as here, a parent's rights may be severely impaired by a school's decision to prevent the parents from seeing or speaking with their child or learning her whereabouts. The conduct of School District Defendants and APD Defendants also extended beyond banning Mr. Ryan from school property, as they refused to provide information about Mya's whereabouts when asked and intentionally prevented Mya's parents from having the opportunity to speak with her in the school parking lot. The seriousness

---

[13] Additionally, many of the cases cited in *Zeyen*—and *Zeyen* itself—involved a divorced parent with visitation rights but not physical custody of their children.

of the parental rights at stake and the relative infrequency with which children run away tip in Plaintiffs' favor insofar as the government's burden is concerned.

As in *Bano*, 788 F. Supp. 3d 408, discussed in the substantive due process section, School District Defendants' and APD Defendants' decision to withhold information about Mya's whereabouts and their other interference with the parent-child relationship in the absence of an emergency raises procedural due process concerns. Plaintiffs have adequately pled this claim.

### A.    Qualified Immunity

"Government officials enjoy qualified immunity when they perform discretionary functions if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that their acts did not violate these clearly established rights." *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999) (cleaned up). "The objective reasonableness test is met—and the defendant is entitled to immunity—if officers of reasonable competence could disagree on the legality of the defendant's actions." *Id.* (internal quotation marks and citations omitted). The court has already concluded that qualified immunity is inappropriate for the underlying substantive due process violation. If APD Defendants and School District Defendants reasonably should have known that they were infringing on Plaintiff's substantive due process rights as parents, they likewise should have known that some process was required before imposing that deprivation. Qualified immunity is thus inappropriate at this stage.

### IV.    Equal Protection Clause (Count 4)

Plaintiffs bring an equal protection claim on the basis that they were "singled out and treated very differently from other parents who have struggled with stereotypical teen rebellion in Amherst." (Doc. 1 ¶ 269.) Specifically, they allege that Defendants "repeatedly and

egregiously violat[ed] school procedures and policies that were in place and followed for other parents and students at Amherst Central High School." (*Id.* ¶ 270.) Defendants respond that Plaintiffs have failed to identify any true comparators to support their equal protection claim.[14] (Doc. 16-2 at 21–22; Doc. 26-1 at 14; Doc. 29-2 at 17.)

When a plaintiff does not allege that they are part of a protected class, they may proceed on either selective enforcement theory or a "class-of-one" theory. "To proceed under a selective enforcement theory, Plaintiffs must plausibly allege that any selective treatment they experienced 'was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [them].'" *Lilakos v. New York City*, 808 F. App'x 4, 8 (2d Cir. 2020) (alteration in original) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). To succeed on a class-of-one theory, Plaintiffs "need not show malice." *Id.* Instead, "they must plausibly allege that 'there is no rational basis for the difference in treatment,' as well as 'an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Id.* (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); then quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).

Beginning with the "class-of-one" theory, Plaintiffs have failed to identify any specific comparators. Instead, they merely allege that they were "singled out and treated very differently from other parents who have struggled with stereotypical teen rebellion in Amherst" (Doc. 1 ¶ 269) and that Defendants "repeatedly and egregiously violat[ed] school procedures and policies that were in place and followed for other parents and students at Amherst Central High School"

---

[14] Sidote Defendants defend against this claim by arguing that they were at no point acting under color of state law. (*See generally* Doc. 25-2.)

(*id.* ¶ 270). Plaintiffs' pleadings are analogous to those in *Camac v. Long Beach City School District* and must likewise be rejected as insufficient:

> Here, there is no question that Plaintiffs have failed to allege the existence of similarly situated comparators. After each allegation of wrongdoing done to Charles, the Complaint simply avers, in wholly conclusory fashion, that 'similarly situated' non-disabled students and/or 'similarly situated' students whose parents did not complain to the District about its failure to accommodate their disabilities were not subjected to the same mistreatment. Aside from assigning these unnamed students the title of 'similarly situated,' the Complaint contains no other allegations showing how 'another person's circumstances . . . are prima facie identical to Charles's. Thus, plaintiffs' equal protection claim must be dismissed.

No. 09-cv-5309, 2011 WL 3030345, at *16 (E.D.N.Y. July 22, 2011) (alteration in original) (quoting *Kamholtz v. Yates County*, No. 08-cv-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008)). Other courts have reached the same conclusion when a plaintiff has failed to identify comparators in a non-conclusory fashion. *See Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07-cv-8828, 2009 WL 3151200 (S.D.N.Y. Sept. 29, 2009) (dismissing equal protection claim where plaintiff alleged that school district wrongfully graduated her from program for disabled children and stopped funding special education program in which she was enrolled based on "discriminatory animus" against plaintiff due to disability, but where plaintiff failed to identify any similarly situated individuals) (collecting cases).

To state a claim under the "selective enforcement" theory, a plaintiff must likewise allege that "they were treated differently from other similarly situated individuals." *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). As already concluded, Plaintiffs have failed to identify any similarly situated individuals in the Complaint. Their selective enforcement theory therefore fails as well.

## V.    Abuse of Process (Count 5)

Plaintiffs bring an abuse-of-process claim based on the allegedly malicious instigation of the CPS investigation.  When analyzing an abuse of process claim under § 1983, the court looks to state law.  *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) ("As with malicious prosecution, we turn to state law to find the elements of the malicious abuse of process claim.").  To prove abuse of process under New York law, a "plaintiff must show that the defendant (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Hernandez v. United States*, 939 F.3d 191, 204 (2d Cir. 2019) (internal quotation marks and citation omitted).

APD Defendants and School District Defendants oppose this claim by arguing that Plaintiffs have not alleged the use of any "legal process" as that term is defined under New York law.  More fundamentally, as the court pointed out in *Zubko-Valva*, § 1983 liability "may not be predicated on a claim of malicious abuse of *civil* process."  607 F. Supp. 3d at 317 (quoting *Alroy v. City of New York Law Dep't*, 69 F. Supp. 3d 393, 402 (S.D.N.Y. 2014) and citing *Cook*, 41 F.3d at 80 for the proposition that a § 1983 abuse-of-process claim has been recognized only for abuse of criminal process, not civil process).  Thus, the court will follow *Zubko-Valva* by rejecting Plaintiffs' abuse of process claim where the underlying process is a "baseless neglect proceeding[]." *Id.*

Because this reasoning applies equally to the abuse-of-process claim against the other defendants, the court need not address their alternative arguments for dismissal.

## VI.    Failure to Intervene (Count 7)

Plaintiffs next bring a claim against all Defendants for "fail[ing] to take reasonable steps to prevent their fellow officers, caseworkers, and school board members from engaging in the illegal acts alleged herein, though they were present at the scene of such violations and were capable of doing so."  (Doc. 1 ¶ 294.)

"To succeed on a failure to intervene claim, [a] plaintiff must demonstrate that: (1) the defendant had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the defendant's position would have known that the plaintiff's constitutional rights were being violated; and (3) the defendant did not take reasonable steps to intervene." *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 134 (N.D.N.Y. 2024).

As a preliminary matter, this court has held that "ordinary citizens have no duty under federal or New York law to intervene to prevent or stop [a] . . . constitutional violation." *James v. City of Rochester*, 673 F. Supp. 3d 279, 291 (W.D.N.Y. 2023).  Plaintiffs' claim must therefore be dismissed with respect to the Sidote Defendants.

The court next turns to the viability of this claim against CPS Defendants and School District Defendants, who argue that only law enforcement officers have a duty to intervene to protect citizens from the infringement of their constitutional rights.  Several courts in this circuit have reached precisely that conclusion.  *See Valverde v. Folks*, No. 19-cv-8080, 2022 WL 836310, at *8 (S.D.N.Y. Mar. 21, 2022) ("It has long been recognized that the duty to intervene to protect the constitutional rights of citizens from infringement by law enforcement officers applies to *law enforcement officials*, not non-police state actors." (emphasis original)) (collecting cases); *see also Phoenix v. Reddish*, 175 F. Supp. 2d 215, 220 (D. Conn. 2001) (noting that "there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a

non-police state actor . . . to intervene"). "The rationale here is clear, as '[u]nlike law enforcement officers such as police or corrections officers, who are sworn to uphold the law, civilian government contractors or employees have no similar duty by virtue of their position of employment." *Rosa v. Cook*, No. 22-cv-703, 2024 WL 1050516, at *4 (D. Conn. Mar. 11, 2024) (alteration in original) (quoting *Akande v. Philips*, 386 F. Supp. 3d 281, 292 (W.D.N.Y. 2019)).

Even if such a duty exists, CPS Defendants and School District Defendants are entitled to qualified immunity on this cause of action. The Second Circuit addressed an analogous situation in *Musso v. Hourigan*, 836 F.2d 736 (2d Cir. 1988), where the plaintiff alleged that a school board member failed to prevent another board member from violating the plaintiff's First Amendment Rights. The Second Circuit noted that, "[a]s a general rule, a government official is not liable for failing to prevent another from violating a person's constitutional rights, unless the official is charged with an affirmative duty to act." *Id.* at 743. The court then held that the school board member had no "'clearly established' affirmative duty to prevent other school board members from infringing on [the plaintiff's] first amendment interests." *Id.* at 744. The defendant was therefore entitled to qualified immunity. *Id.* Plaintiffs have not cited to any case law suggesting that CPS officials or school administrators have an affirmative duty to prevent the kinds of constitutional violations alleged to have occurred in this case, nor has the court found any cases to that effect.

The court now turns to the question of whether Plaintiffs have stated a claim for failure to intervene against APD Defendants. APD Defendants acknowledge that law enforcement officers have an affirmative duty to intervene to prevent the infringement of a person's constitutional rights by other law enforcement officers. Instead, they argue that Plaintiffs have failed to state a claim on three grounds: (1) Plaintiffs have failed to specify when and how the APD Defendants

failed to intervene in a violation of Plaintiffs' constitutional rights; (2) Plaintiffs have failed to plead facts that would establish that APD Defendants knew or should have known that Plaintiffs' constitutional rights were being violated; and (3) there was no underlying constitutional violation.

The court will consider each alleged constitutional violation in turn. Because only viable claims can serve as the underlying basis for a failure-to-intervene claim, the court will only analyze those alleged violations that have survived the motions to dismiss.

Beginning with Plaintiff's First Amendment retaliation claim, Plaintiffs have alleged little to no facts about the circumstances under which the allegedly retaliatory CPS report was filed. They simply allege on information and belief that one or more of the defendants submitted the report. (Doc. 1 ¶ 233.) Without more, these facts do not support the inference that any APD defendant had a "realistic opportunity to intervene and prevent the harm" or that any APD defendant was even aware that such a report was being filed. *Thomas*, 711 F. Supp. 3d at 134. Mere speculation is insufficient.

Plaintiffs' allegations regarding their substantive due process claim likewise fail to support a plausible inference of failure to intervene. As a preliminary matter, "[a] police officer cannot be liable on a failure to intercede theory . . . if he participates directly in the alleged constitutional violation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 392 (S.D.N.Y. 2021); *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016) ("[D]efendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation."). Because the Complaint alleges that all APD Defendants were involved in preventing Mr. Ryan from meeting with Mya on June 3, they cannot be liable for failing to intervene in that particular instance.

With respect to the other alleged acts that make up Plaintiffs' substantive due process claim, Plaintiffs have not alleged facts supporting the inference that APD Defendants were aware of or had the opportunity to intervene in those acts. First, there are no alleged facts to demonstrate how APD Defendants could have intervened to prevent the school from issuing a no-trespass order against Mr. Ryan. The Complaint also alleges that Detectives Smith and Schneider were involved in preventing Mya from going to her BOCES program, so there can be no failure-to-intervene claim against them on the same basis, and the Complaint contains no allegations that Officer Betchel was aware of that plan or had the opportunity to intervene. And the Complaint alleges that Officer Betchel, Detective Smith, and Detective Schneider were all personally involved in escorting Mya to the school's back parking lot to prevent her from seeing her parents. Thus, at each point, the Complaint either alleges that the individual APD Defendants were the direct perpetrators of the unconstitutional act, or there are no facts to support those defendants' knowledge of and ability to intervene in the alleged unconstitutional act.

Finally, nothing in the Complaint supports the inference that APD Defendants failed to intervene in the violation of Plaintiffs' due process rights. Plaintiffs have alleged few if any facts directly related to the procedural due process claim, as Plaintiffs do not allege the insufficiency of the process that occurred but, rather, that there was no process at all. Further, to the extent that both APD Defendants and School District Defendants deprived Plaintiffs of their liberty interests as parents, both would be liable for any procedural due process violation. Thus, APD Defendants could not also be liable for failing to intervene in that deprivation.

## VII.    Conspiracy to Violate Plaintiffs' Constitutional Rights (Count 8)

Plaintiffs allege that all named defendants "conspired amongst themselves to fabricate a story that [Ms. Kreuder and Mr. Ryan] were not fit to care for Mya because, as concerned parents, they expressed their frustration regarding the unreasonable deprivation of their daughter." (Doc. 1 ¶ 304.) Plaintiffs further allege that Defendants "agreed to deprive [Ms. Kreuder and Mr. Ryan] of their constitutional rights . . . by physically preventing [them] access to their daughter." (*Id.* ¶ 305.)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). "In order to sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's constitutional rights." *Dill v. Village of Gowanda*, 952 F. Supp. 989, 995 (W.D.N.Y. 1997) (internal quotation marks omitted); *see also Kim v. Saccento*, No. 21-2865, 2022 WL 9583756, at *2 (2d Cir. Oct. 17, 2022) (summary order) (section 1983 conspiracy claim against otherwise private defendants requires that they "acted in concert" with state actors to commit an unconstitutional act; meaning there must be "a meeting of the minds, such that the defendants entered into an agreement, express or tacit, to achieve the unconstitutional end" (cleaned up)).

Because Plaintiffs allege a conspiracy to violate their First, Fourth, Fifth, and Fourteenth Amendment rights, they appear to argue that each of the individually alleged constitutional violations was part of a conspiracy by Defendants. However, where there is no underlying constitutional violation, a § 1983 conspiracy claim cannot survive. *Mitchell v. County of Nassau*,

786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011) ("[A] § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation."). The court therefore considers in turn Plaintiffs' conspiracy claim as it relates to the alleged constitutional violations that survive the motion to dismiss.

### A.    First Amendment Retaliation

As discussed above, Plaintiffs have successfully alleged First Amendment retaliation by APD Defendants and School District Defendants. The allegations in the Complaint do not plausibly support a claim of conspiracy, however. Although the Second Circuit has recognized that "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," it has also cautioned that "conclusory allegations of a § 1983 conspiracy are insufficient." *Pangburn*, 200 F.3d at 72 (cleaned up). The allegations in this case fall on the conclusory side of that spectrum. Plaintiffs do not allege any details about who made the CPS complaint or any circumstantial evidence that APD Defendants and School District Defendants acted in concert in submitting it. The only evidence to support the conspiracy claim is that all of the APD Defendants and School District Defendants were present during the altercation on June 3 that allegedly led to the filing of the CPS complaint. That allegation is insufficient to raise Plaintiffs' claim above the level of speculation.

### B.    Substantive Due Process

By contrast, Plaintiffs have alleged sufficient facts to support their claim for conspiracy to violate their substantive due process rights. Defendants are correct that the Complaint includes some conclusory allegations, such as the claim that Defendants "conspired amongst themselves to fabricate a story that [Ms. Kreuder and Mr. Ryan] were not fit to care for Mya." (Doc. 1 ¶ 304.) Defendants are also correct that Plaintiffs have failed to allege precisely how and

64

when Defendants entered into an agreement to interfere with Ms. Kreuder's and Mr. Ryan's parental rights. Nevertheless, as noted above, courts may rely on circumstantial evidence to support an inference of an explicit or tacit agreement. *See Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 318 (N.D.N.Y. 2023) ("While there are legal limitations upon the inferences which may be drawn from circumstantial evidence, a conspiracy is often difficult to prove and the court, may at times, have to rely on circumstantial evidence of a conspiracy." (cleaned up)).

In *Lalonde*, where defendant police officers allegedly attacked the plaintiff, the court remarked that "a meeting of the minds is plausibly suggested by the coordinated nature of the alleged attack, and the fact that the attack was not a spontaneous reaction to any threat." *Lalonde*, 622 F. Supp. 3d at 318 (quoting *Foskey v. Northrup*, No. 20-cv-0504, 2021 WL 1146217, at *5 (N.D.N.Y. Mar. 25, 2021)). Though this case does not involve an attack, the situation here is analogous to the ones at issue in *Lalonde* and *Foskey*. When Ms. Kreuder and Mr. Ryan arrived at Amherst Central High School on June 3, Defendants knew they were coming. It was not spontaneous. And Defendants had a uniform approach to the situation: Mr. Ryan could not speak with Mya, but Ms. Kreuder could. This coordination and the pre-planned nature of the encounter gives rise to an inference that APD Defendants and School District Defendants had discussed ahead of time their decision to forbid Mr. Ryan from seeing his daughter. Furthermore, the Complaint alleges that the principal, Mr. Pigeon, had spoken to the counselor, Mr. Benton, about Mya's past allegations of abuse against Mr. Ryan. The coordinated effort between Principal Pigeon, Officer Bechtel, Detective Smith, and Detective Schneider to usher Mya to the school's back parking lot further suggests a meeting of the minds. The same allegations also support the requirement that Defendants agreed to engage in conduct

that constituted a deprivation of Plaintiffs' rights and that they took overt steps in achieving that end.

### C.    Procedural Due Process

As noted in the court's discussion of Plaintiffs' failure-to-intervene claim, the Complaint contains few, if any, factual allegations regarding their procedural due process claim.  This case does not concern an allegedly unfair hearing, and there are no allegations that Defendants discussed but ruled out the possibly of providing Plaintiffs with some kind of process.  In the absence of any such allegations, the Complaint cannot support a claim for conspiracy to violate Plaintiffs' procedural due process rights.

## VIII.  *Monell* Liability (Counts 9 and 10)

Counts 9 and 10 of the Complaint seek to hold the Town of Amherst, Amherst Central School District, and the Amherst Central School District Board liable for the alleged constitutional violations set forth in the other counts.

As the Supreme Court explained in *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), a local governmental entity is only liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  "[W]hen a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority."  *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).

### A.    Town of Amherst

Plaintiffs allege that,

> [a]t all relevant times, defendant Town of Amherst was aware that defendants
> Officer Mark Bechtel, Detective Ronald Smith, and Detective Dave Schneider were
> inadequately trained regarding the parental rights of parents under the First, Fourth
> Fifth, and Fourteenth Amendments, yet defendant Town of Amherst maintained a
> policy or custom of failing to provide [those] defendants . . . training on the First,
> Fourth, Fifth, and Fourteenth Amendments, parental rights, or adequate supervision
> over them.

(Doc. 1 ¶ 311.) They further allege that the Town had a policy, custom, or practice of interfering

with Plaintiffs' parental rights "because the Town and its employees had personal animus

towards Plaintiffs." (*Id.* ¶¶ 313–14.)

The Town attacks these allegations as impermissibly vague. (Doc. 29-2 at 26.) In

response, Plaintiffs maintain that (1) they have alleged misconduct by Town policymakers;

(2) they have alleged multiple incidents of unconstitutional behavior by APD Defendants, which

is sufficient to demonstrate that they were acting pursuant to a Town policy; and (3) they have

alleged a failure to train and supervise that amounts to deliberate indifference. (Doc. 30 at 44–

45.)

### 1.    Involvement of Policymakers

Plaintiffs argue that "[t]he involvement of multiple police officers, including detectives,

suggests that the alleged conduct was not merely the actions of low-level employees, but

reflected department policy or custom." (Doc. 30 at 44.) As an initial matter, "detectives are not

policymaking officials for purposes of *Monell* liability," so the involvement of Detectives Smith

and Schneider does not support Plaintiffs' position. *Harris v. City of New York*, No. 15-cv-8456,

2017 WL 6501912, at *10 (S.D.N.Y. Dec. 15, 2017); *see also Petaway v. City of New Haven

Police Dep't*, 541 F. Supp. 2d 504, 514–15 (D. Conn. 2008) ("Petaway has failed to provide any

evidence that . . . Detective Fitzgerald or Sergeant Costin qualified as policymaking officials.");

*Richardson v. City of New York*, No. 17-cv-8622, 2020 WL 5754989, at *6 (S.D.N.Y. Aug. 24,

2020) ("Richardson's claims—and the evidence in the record relating to those claims—focus on the actions of individual detectives, none of whom have policymaking responsibilities.").

Plaintiffs' briefing seems to imply that, because so many APD officials were involved in the alleged misconduct, Town policymakers must have been involved in the misconduct. Plaintiffs have only alleged the involvement of three APD employees. The involvement of those three employees does not support a plausible inference that they were acting pursuant to a Town policy. In the absence of any allegations of direct involvement of Town policymakers, Plaintiffs cannot establish *Monell* liability on this theory.

### 2.    Pattern of Misconduct

"[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on a theory that the relevant practice is so widespread as to have the force of law." *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). Likewise, a pattern of misconduct, "if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Here, Plaintiffs contend that the "Complaint describes an ongoing pattern of conduct by multiple Town officials over several months" sufficient to constitute a policy under *Monell*. (Doc. 30 at 44.) Plaintiffs identify four examples of this ongoing conduct:

(1) Repeated failures to notify Ms. Kreuder and Mr. Ryan of Mya's whereabouts, citing to the Complaint at paragraphs 105–111;

(2) Multiple instances of concealing Mya's whereabouts, citing to the Complaint at paragraphs 76–82;

(3) Ongoing interference with Ms. Kreuder's and Mr. Ryan's attempts to contact Mya, citing to the Complaint at paragraphs 119–120; and

(4) A pattern of coordinating with other defendants to keep Mya away from her parents, citing to the Complaint at paragraphs 145–150.

(Doc. 30 at 44.)

The only allegation related to APD Defendants in paragraphs 105–111 of the Complaint is that, when Ms. Kreuder and Mr. Ryan made another missing report to the APD on June 1, they were "met with snide comments and reluctance from the officers with whom they spoke." (Doc. 1 ¶¶ 105–106.) Making snide remarks does not amount to concealing Mya's whereabouts. The other cited paragraphs allege that *school* officials refused to disclose Mya's whereabouts. Likewise, ¶¶ 76–82 make allegations regarding School District Defendants, but not APD Defendants. Paragraphs 119–120 are allegations regarding alleged coordination between School District Defendants and APD Defendants to ensure that Mya did not speak with her parents on June 3. Paragraphs 145–150 allege that APD Defendants and Mr. Pigeon coordinated to have Mya picked up in the back lot.

The conduct attributable to APD employees, as cited in these examples, covers a span of three days, not "several months," as Plaintiffs claim in their brief. They involve three discrete incidents, one of which involved no actual interference with Plaintiffs' parental rights. The other two incidents occurred on the same day and involved the same three APD employees. These allegations simply do not support an inference of a policy so "persistent or widespread as to acquire the force of law." *Reynolds*, 506 F.3d at 192.

### 3.    Failure to Train

"The existence of an official municipal policy or custom can . . . be demonstrated by establishing a deliberate government policy of failing to train or supervise its officers." *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003). "Municipal liability attaches 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). The Second Circuit has identified "three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens": (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992).

"[D]eliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs[.]" *Floyd v. City of New York*, 959 F. Supp. 2d 540, 564 (S.D.N.Y. 2013) (alterations in original) (quoting *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)) (further citation omitted). To demonstrate that the need for more training was obvious, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'" *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997). The Supreme Court has also indicated that there is "a narrow range of circumstances" in which "a pattern of similar violations

might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63. "To fall within this exception, 'the unconstitutional consequences of failing to train' must be 'so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Reinhardt v. City of Buffalo*, No. 21-cv-206, 2021 WL 2155771, at *8 (W.D.N.Y. May 27, 2021) (quoting *Connick*, 563 U.S. at 63)).

Plaintiffs argue they have sufficiently pled failure to train amounting to deliberate indifference because the Complaint alleges that the Town "was aware" that Officer Bechtel and Detectives Smith and Schneider "were inadequately trained regarding . . . parental rights . . . , yet [the] Town . . . maintained a policy or custom of failing to provide [those] defendants . . . training on the First, Fourth, Fifth, and Fourteenth Amendments, [and] parental rights." (Doc. 1 ¶ 311). Those allegations, standing alone, are insufficient. Although "[t]he inference that [an unconstitutional] policy existed may arise from circumstantial proof, . . . [t]he mere assertion . . . that a municipality has such a custom or policy is insufficient," as is "the simple recitation that there was a failure to train municipal employees." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. Coordination Unit*, 507 U.S. 163 (1993). Rather, the Complaint must allege facts to support the conclusory allegation that the Town knew its officers had not received adequate training—either through allegations that similar constitutional violations had occurred in the past or by demonstrating that "the unconstitutional consequences of failing to train" were "so patently obvious" that the Town can nevertheless be held liable. *Connick*, 563 U.S. at 62. Thus, in *Packard v. City of New York*, No. 15-cv-7130, 2017 WL 11580887 (S.D.N.Y. Mar. 2, 2017), the court found that the plaintiffs have plausibly pled a failure to train after finding that they had pled that the city had "a history of arresting protestors for disorderly conduct absent criminal

conduct"—the alleged constitutional violation in that case—with appended reports demonstrating "a documented history of the conduct sufficient to put the City on notice." *Id.* at *8.

Plaintiffs have not alleged a "pattern of similar constitutional violations by untrained employees." *Id.* Nor is this a case in which "the unconstitutional consequences of failing to train" were "so patently obvious" that the Town can nevertheless be held liable. *Connick*, 563 U.S. at 62. In *Connick*, the Supreme Court said that one example satisfying that standard would be a city that arms its police officers with firearms and instructs them to capture fleeing felons:

> Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, . . . a city's decision not to train the officers about constitutional limits on use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights.

*Id.* at 63. Whereas police often deal with fleeing felons, Plaintiffs have made no allegation that police regularly deal with runaway youth. Undoubtedly the situation arises, but New York law also places primary responsibility on the ultimate placement and disposition of runaway youth on CPS and on certified facilities that specialize in assisting runaway youth. *See* N.Y. Fam. Ct. Act § 718 (providing for police officers to return a runaway child to their parent or guardian if the child "in the reasonable conclusion of the officer, appears to have run away from home without just cause," but otherwise directing police officers to take runaway youth to a certified facility approved to house runaway youth, which then takes responsibility for informing parents of child); *see also* N.Y. Exec. Law § 532-c (requiring staff of runaway youth crisis programs to keep parents informed of the location, "physical and emotional condition, and the circumstances surrounding the runaway youth's" decision to run away unless there are "compelling

circumstances why the parent . . . should not be so notified" and further requiring that staff report any suspected abuse or neglect to CPS).

In light of the foregoing, Plaintiffs have failed to plausibly plead a failure-to-train claim under *Monell* against the Town.

### B.    Amherst Central School District and Board of Education

Plaintiffs also bring a *Monell* claim against the Amherst Central School District and the Amherst Central School District Board of Education. "For the purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under *Monell*." *Moskowitz v. Great Neck Union Free Sch. Dist.*, No. 20-cv-1659, 2021 WL 4268138, at *11 (E.D.N.Y. 2021) (quoting *Scaggs v. N.Y. Dep't of Educ.*, No. 06-cv-0799, 2007 WL 1456221, at *14 (E.D.N.Y. May 16, 2007)).

Defendants argue that Plaintiffs' allegations are conclusory and therefore insufficient to state a claim. Plaintiffs respond that (1) the Complaint alleges unconstitutional actions by policymakers; (2) they have alleged multiple incidents of unconstitutional behavior by School District Defendants, which is sufficient to demonstrate that they were acting pursuant to School District or Board policy; (3) they have alleged a failure to train and supervise that amounts to deliberate indifference; and (4) they have demonstrated that policymakers ratified the unconstitutional conduct of their subordinates. (Doc. 30 at 22–24.)

### 1.    Involvement of Policymakers

Plaintiffs contend that Principal Pigeon is a policymaker for *Monell* purposes and that his alleged involvement in the constitutional violations therefore supports their bid to hold the School District and Board liable. Defendants dispute that any policymaker was involved in the alleged conduct.

"Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (internal quotation mark and citations omitted). "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008). With respect to New York school principals, the Second Circuit has looked to New York's education laws to determine how policymaking authority is divided among principals, school boards, superintendents, and chancellors. *See Agosto*, 982 F.3d at 98–99 (looking to N.Y. Educ. Law § 2590-i to determine that the chancellor, not the principal, had policymaking authority over the matters at issue in that case). And the Second Circuit has stressed the importance of differentiating between "a principal's final decisions" and "a municipality's final policies," even when "the ultimate harm that befell the plaintiff was under the principal's control." *Id.* at 100–01 (internal quotation marks and citation omitted).

Section 1709 of the N.Y. Education Law assigns responsibility to boards of education "[t]o establish such rules and regulations concerning the order and discipline of the schools, in the several departments thereof, as they may deem necessary to secure the best educational results." N.Y. Educ. Law § 1709(2). It further provides that boards of education "have in all respects the superintendence, management and control of said . . . schools." *Id.* at § 1709(13). Boards of education also have responsibility for creating codes of conduct governing the conduct of "students, teachers and other school personnel as well as visitors," *id.* at § 2801(2), and for developing a "comprehensive district-wide school safety plan and building-level emergency

response plans regarding crisis intervention, emergency response and management," *id.*
at § 2801-a(1).

Under New York law, boards of education hold the policymaking authority for rules and
regulations regarding:

- student safety, N.Y. Educ. Law §§ 1709, 2801, 2801-a;

- communication with parents, *Mullin v. Bd. of. Educ. of E. Ramapo Cent. Sch.
  Dist.*, 421 N.Y.S. 2d 523, 527 (N.Y. Sup. Ct. 1979) ("Since communication with
  parents is admittedly fundamental to the educational process, it comes within the
  responsibility imposed upon the administrators by statute with respect to
  management and control of the educational affairs of the District (see Education
  Law §§ 1709 and 1711).");

- restriction of visitors—including parents—from school properties, N.Y. Educ.
  Law § 2801; and

- parental involvement in children's education, 42 Educ. Dep't Rep., Decision No.
  14829, 2003 WL 26095051 (N.Y.S. Educ. Dep't Jan. 9, 2003).

While the principal may have the ultimate responsibility for enforcing those policies, the
principal does not make them.

As in *Agosto*, Plaintiffs have failed to cite any case law indicating that Principal Pigeon
had final policymaking authority regarding the policies at issue in this case.  Thus, *Monell*
liability against the School District and Board of Education cannot attach because of his
involvement in the alleged constitutional violations.

Briefly, the court acknowledges that, according to the Complaint, School District
Superintendent Anthony Panella was the official who informed Mr. Ryan that a no trespassing

order had been issued against him based on the events of June 3. (Doc. 1 ¶ 153.) The Complaint includes no allegations, however, that anyone informed Mr. Panella of the situation with Mya or the reason for the altercation or June 3. Nor does the Complaint contain allegations explaining Mr. Panella's role in deciding to issue the no trespassing order. Mr. Panella's alleged involvement in issuing the no trespassing order does not, therefore, make it plausible that that Plaintiffs' injuries were caused by a School District or Board policy aimed at preventing parents from making contact with their runaway children.

### 2.    Pattern of Misconduct

As with the APD Defendants, Plaintiffs contend that "[t]he Complaint describes an ongoing pattern of conduct by multiple school officials over several months." (Doc. 30 at 22.) If sufficiently pervasive, such a pattern of misconduct could constitute a "policy" for the purposes of *Monell*. *Reynolds*, 506 F.3d at 192. Plaintiffs identify four examples of this ongoing conduct:

(1) Repeated failures to notify Ms. Kreuder and Mr. Ryan of Mya's school absences, citing to the Complaint at paragraphs 107–110;

(2) Multiple instances of concealing Mya's whereabouts, citing to the Complaint at paragraphs 76–82;

(3) Ongoing interference with Ms. Kreuder's and Mr. Ryan's attempts to contact Mya, citing to the Complaint at paragraphs 119–120; and

(4) A pattern of coordinating with other defendants to keep Mya away from her parents, citing to the Complaint at paragraphs 145–150.

(Doc. 30 at 22.)

School District Defendants' alleged conduct occurred over a relatively short time frame. Mya allegedly ran away from home on or about May 23. The attempted meeting between Mya

and her parents occurred on June 3, as did the complaint to CPS. The last conduct alleged against anyone affiliated with the School District or Board occurred on June 6, when Superintendent Anthony Panella allegedly notified Mr. Ryan that a "no trespassing" order had been issued against him based on the events of June 3.

"While "[t]here is no set number of incidents that make a practice "widespread," . . . courts have found a wide range of instances,' including allegations of two, three, four, eight, and even thirteen examples, 'insufficient to plausibly allege a municipal custom.'" *Mumin*, 760 F. Supp. 3d at 60 (collecting cases) (alterations in original) (quoting *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 491–92 (E.D.N.Y. 2018)). In this case, the allegations do not support a plausible inference that School District employees had such a widespread practice of denying parents access to and information about their children as to constitute a policy. Plaintiffs describe only their own, isolated experience, which occurred over a relatively short time frame. Without more, that is not enough to establish *Monell* liability. *See id.* at 58–59 (dismissing *Monell* claim where plaintiff pointed to only two cases in which defendant had denied a religious accommodation, holding that such "sparse pleading falls short of nudging a *Monell* claim that there was a persistent and widespread practice of denying all religious accommodations and granting all medical accommodations across the line from conceivable to plausible").

### 3.    Failure to Train

As noted above, *Monell* liability may attach where a failure to train or supervise demonstrates deliberate indifference. A plaintiff must plausibly plead that each of the three requirements outlined in *Walker* is present.

As above, Plaintiffs have not alleged a pattern of similar constitutional violations in the past. Nor have they made any allegations to support the conclusion that the alleged failure to train implicates the "patently obvious" exception; the Complaint contains no allegations about the frequency with which youth run away in New York or the Amherst area or whether schools regularly act as the setting for mediation between parents and runaway youth. Although it seems possible that schools deal with situations like the one in this case on a periodic basis, the court cannot make that assumption—whereas the *Connick* court referenced the "known frequency" with which police must apprehend fleeing felons in its example of the "patently obvious" exception, there is no "known frequency" with which schools must deal with mediating between runaway youth and their parents. 563 U.S. at 63. Plaintiffs' *Monell* claim cannot survive on a failure-to-train theory.

#### 4.    Ratification of Unconstitutional Conduct

One "method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty*, 361 F.3d at 126. The court has already explained that Principal Pigeon is not a policymaker for the purposes of this case. The court has also concluded that the alleged facts do not support the inference that Superintendent Panella was aware of his subordinates' allegedly unconstitutional actions. Further, Plaintiffs have not alleged such extensive conduct that it would support the inference that the School District or Board was aware of—but did nothing about—the alleged constitutional violations.

IX.    **State-Law Claims (Counts 11 and 12)**

The Complaint alleges two state-law claims against Sidote Defendants: negligent infliction of emotional distress and negligence. None of Plaintiffs' federal claims against Sidote Defendants have survived the motion to dismiss. Sidote Defendants therefore urge that the court decline to exercise supplemental jurisdiction over the state-law claims against them. (Doc. 25-2 at 18.)

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "For purposes of section 1367(a), claims form part of the same case or controversy if they derive from a common nucleus of operative fact." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (internal quotation marks and citation omitted). "Where section 1367(a) is satisfied, the discretion to decline supplemental jurisdiction is available *only if* founded upon an enumerated category of subsection 1367(c)." *Id.* (internal quotation marks and citation omitted).

In this case, Sidote Defendants invoke §1367(c)(3), which provides that a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "In general 'where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.'" *Bolt v. Planned Parenthood of Cent. & W. N.Y.*, 763 F. Supp. 3d 463, 476 (W.D.N.Y. 2025) (quoting *Klein & Co. Futures v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006)).

In this case, the court has *not* dismissed all of the claims over which it has original jurisdiction. Although it will dismiss all of the federal claims against Sidote Defendants and CPS Defendants, it will not dismiss four of the federal claims against APD Defendants and School District Defendants. *See Rice v. City of New York*, 275 F. Supp. 3d 395, 406 (E.D.N.Y. 2017) (holding that court could not decline jurisdiction on the basis of § 1367(c)(3) were court retained original jurisdiction over federal causes of action against other defendants); *see also DeFazio v. Wallis*, 500 F. Supp. 2d 197, 210 (E.D.N.Y. 2007) (same). Thus, unless the claims against Sidote Defendants do not form part of the same case or controversy as the claims over which the court has original jurisdiction, the court cannot decline to exercise supplemental jurisdiction.

"In determining whether two disputes arise from a common nucleus of operative fact, [the Second Circuit has] traditionally asked whether the facts underlying the federal and state claims substantially overlapped or the federal claim necessarily brought the facts underlying the state claim before the court." *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 134 F.4th 73, 80 (2d Cir. 2025) (cleaned up). "This is so even if the state law claim is asserted against a party different from the one named in the federal claim." *Id.* (internal quotation marks and citation omitted).

In this case, the facts underlying the federal law and state law claims substantially overlap, even though they diverge at times. All the claims concern Mya running away from home, the harm that befell her at the Sidote home, Ms. Kreuder's and Mr. Ryan's attempts to reconcile with their daughter, and the allegations of neglect and abuse leveled at Ms. Kreuder and Mr. Ryan. Defendants have not challenged that the claims against them are part of the same case or controversy as the federal claims.

The Sidote Defendants have not challenged the state-law claims on the merits, so the court will not dismiss them on substantive grounds.

### Conclusion

CPS Defendants' Motion to Dismiss (Doc. 16) is DENIED IN PART and GRANTED IN PART. The motion is DENIED with respect to Count 1. It is otherwise GRANTED.

Sidote Defendants' Motion to Dismiss (Doc. 25) is DENIED IN PART and GRANTED IN PART. The motion is DENIED with respect to Counts 11 and 12 of the Complaint. It is otherwise GRANTED.

School District Defendants' Motion to Dismiss (Doc. 26) is DENIED IN PART and GRANTED IN PART. It is DENIED with respect to Counts 1, 2, and 3. It is also DENIED with respect to Count 8 insofar as that count alleges conspiracy to violate Plaintiffs' substantive due process rights. The motion is otherwise granted.

APD Defendants' Motion to Dismiss (Doc. 29) is DENIED IN PART and GRANTED IN PART. It is DENIED with respect to Counts 1, 2, and 3. It is also DENIED with respect to Count 8 insofar as that count alleges conspiracy to violate Plaintiffs' substantive due process rights. The motion is otherwise granted.

Dated this 30th day of December, 2025.

Geoffrey W. Crawford, Judge
United States District Court